Chase *v.* Silverstone.

---

## DANIEL K. CHASE *vs.* MICHAEL SILVERSTONE.

*Damnum absque injuria. Case. Subterranean water—course diverted by well.*

The defendant having dug his well on his own land, in good faith, for the obtaining of water for his own domestic uses, is not liable for any damage which incidentally resulted to the plaintiff by reason of thereby diverting the water which had been accustomed to percolate or flow, in an unknown subterranean current, into the plaintiff's spring.

ON REPORT.

CASE against the defendant for digging a well on his own land whereby the waters of a living spring upon that of the plaintiff were diverted. Neither party supposed the well would have that effect when it was dug. The plaintiff supplied his house and barn by pipes from his spring, the water flowing naturally into tanks. In sinking his well the defendant's workmen struck a vein of water that filled the well and overflowed the yard; to dispose of the water, a drain was made a foot or two below the top of the well so as to carry the overflow to the street gutter, ineffectual attempts having been made, in various ways, to check the flow. The result

was that the plaintiff's natural supply was cut off and he had to put a pump into his spring. This spring was shown to have existed there for thirty or forty years, at least.

The court were to enter such judgment as the law upon the facts required.

*F. A. Pike* for the plaintiff cited *Dickinson v. Grand Junction Canal Co.*, 9 Eng. L. & Eq., 513; *Dexter v. Providence Acq. Co.*, 1 Story Cir. C., 387; *Smith v. Adams*, 6 Paige, 435; *Bassett v. Salisbury*, 43 N. H., 569; *Swett v. Cutts*, 50 N. H., 439. In the cases of *Acton v. Bell*, 12 Mees. & W., 324, and *Greenleaf v. Francis*, 18 Pick., 117, the wells injured had not existed twenty years and were not natural streams coming to the surface.

*J. & G. F. Granger*, for the defendant.

VIRGIN, J.   This court has had frequent occasion to enunciate the rules regulating the relative rights and liabilities of riparian proprietors and apply the principle of "reasonable use" to the peculiar circumstances of each particular case; and in two cases—*Lansil v. Bangor*, 51 Maine, 521, and *Greely v. Maine Cen. R. R. Co.*, 53 Maine, 200—have determined the rights and liabilities of landowners in relation to mere surface water. But this is the first case which has called upon us to declare the law which governs proprietors of adjacent lands in relation to sub-surface waters not gathered into a fixed, known channel.

Is a landowner, who, by digging a well in his own land for his own domestic purposes, thereby diverts underground waters and thus prevents them from percolating into a coterminous proprietor's spring to the owner's damage, liable for such damage; or, does such a diversion fall within one of those large and distinct classes of cases cropping out over the whole domain of "wrongs independent of contract," in which appreciable damage and loss are incidentally occasioned to an individual by the act of another, and yet no redress is given him by the law, and to which the law applies the phrase—"*damnum absque injuria ?*"

Chase v. Silverstone.

We feel compelled by the vastly preponderating weight of authority to place the decision upon the latter alternative; and shall content ourselves with briefly alluding to a few of the principal adjudicated cases without any extended discussion of the principles upon which they are based.

An eminent jurist has well said that the doctrine of the civil law—"*cum eo qui in sua fodiens, vicini fontem avertit, nihil posse agi; nec de dolo: Et sane actionem non debet habere; si non animo vicino nocendi, sed suum agrum meliorem faciendi id fecit,*" or, (as translated by Maule, J., in *Acton v. Blundel*, 12 Mees & W., 335,) "if a man digs a well in his own field, and thereby drains his neighbor's, he may do so unless he does it maliciously,"—contains the germ of the present English and American law upon the subject, so far as that may be regarded as settled.

Such was the view of the court in *Greenleaf v. Francis*, 18 Pick., 117, as expressed by Putnam, J.,—"By the common law the owner of the soil may lawfully occupy the space above as well as below the surface, to any extent which he pleases, in the absence of any grant, agreement, or statute or police regulation to the contrary. * * These rights should not be exercised from mere malice. * * He may obstruct the light and air above and cut off the springs of water below the surface. * * The defendant dug his well in that part of his own ground where it would be most convenient for him. It was a lawful act, and although it may have been prejudicial to the plaintiff, it is *damnum absque injuria*."

So, in *Parker v. B. & M. Railroad*, 3 Cush., 107, in discussing the relative rights of owners of lands, C. J. Shaw, on page 114, said: "Each owner of land has a right to make a proper use of his own estate, and sinking a well upon it is such proper use; and if water, by its natural current, flows from one to the other, and a loss ensues, it is *damnum absque injuria*."

The first leading and most frequently cited English case wherein the rules regulating riparian rights were held inapplicable to percolating waters, is that of *Acton v. Blundel*, 12 Mees. & W.,

335, decided in 1843, in the Exchequer chamber. The plaintiff's cotton-mill was carried by water raised from a well in his own land. Subsequently the defendant sunk a coal-pit in his own land, one-half mile from the plaintiff's well, whereby the latter's supply of water was destroyed. Tindall, C. J., after discussing the known state and condition of water in surface-channels and the well settled rules governing riparian rights, says: "But in the case of a well sunk by a proprietor in his own land, the water which feeds it from a neighboring soil does not flow openly in the sight of the neighboring proprietor, but through the hidden veins of the earth beneath its surface; no man can tell what changes these underground sources have undergone in the progress of time; it may be, that it is only yesterday's date that they first took the course and direction which enabled them to supply the well; again no proprietor knows what portion of water is taken from beneath his own soil; how much he gives originally, or how much he transmits only, or how much he receives; on the contrary, until the well is sunk, and the water collected by draining into it, there cannot properly be said, with reference to the well, to be any flow of water at all. * * If the man who sinks the well in his own land can acquire by that act an absolute and indefeasible right to the water that collects in it, he has the power of preventing his neighbor from making any use of the spring in his own soil which shall interfere with the enjoyment of the well. He has the power still further of debarring the owner of the land in which the spring is first found, or through which it is transmitted, from draining his land for the proper cultivation of his soil. * * The advantage on one side, and the detriment to the other, may bear no proportion. The well may be sunk to supply a cottage, or a drinking place for cattle, whilst the owner of the adjoining land may be prevented from mining metals and minerals of inestimable value. And, lastly, there is no limit of space within which the claim of right to an underground spring can be confined." The opinion concludes as follows: "We think this case for the reasons given, is not to be governed by the law which applies to rivers and flowing streams, but that it rather

falls within the principle which gives the owner of the soil all that lies beneath the surface; that the land immediately below is his property, whether it is solid rock, or porous ground, or venous earth, or part soil, part water, that the person who owns the soil may dig therein, and apply all that is there found to his own purposes at his free will and pleasure ; and that if, in the exercise of such right, he intercepts and drains off the water collected from underground springs in his neighbor's well, this inconvenience to his neighbor falls within the description of *damnum absque injuria,* which cannot become the ground of action."

In 1852, the Court of Exchequer, in *Dickinson v. Grand Junc. Canal Co.,* 7 Exch., 282, held, that at common law, the defendants, by sinking a well upon their own premises and thereby preventing water from percolating in its natural course into the river on which the plaintiff's mill was situated, to his damage, were liable in an action therefor. But the same court, four years later, in *Broadbent v. Ramsbotham,* 11 Exch., 602, held that where the plaintiff's mill had, for more than fifty years, been worked by the stream of a brook supplied by the water of a pond filled by rain, a shallow well supplied by subterranean waters, a swamp and a well formed by a stream springing out of the side of a hill, the waters of all which occasionally overflowed and ran down the defendant's land in no definite channel into the brook—the plaintiff had no right as against the defendant, to the natural flow of any of the waters. Alderson, B., in the opinion of the court, on page 614, says : "No doubt all the water falling from heaven and shed upon the surface of a hill, at the foot of which a brook runs, must by the natural force of gravity, find its way to the bottom and so into the brook ; but this does not prevent the owner of the land on which this water falls from dealing with it as he may please and appropriating it. He cannot, it is true, do so if the water has arrived at, and is flowing in, some natural channel already formed. But he has a perfect right to appropriate it before it arrives at such a channel."

But the English case which received the most consideration is *Chasemore v. Richards,* Clerk to Croydon Local Board of Health,.

2 H. &. N., 168; S. C., 7 H. L. Cas., 349. The plaintiff's mill had been propelled more than sixty years by the river Wandle having its rise in Croydon and being fed largely by the rainfall on a large territory including the town. The rainfall percolated through the ground to the river. The defendants sunk a deep well in their land a quarter of a mile from the rise of the river, and by pumping the water for supplying the town, thereby abstracted and diverted so much of the underground water which would otherwise have found its way into the river as appreciably retarded the mill. In an action for the diversion, the court of Exchequer, in 1856, gave judgment to the defendants, upon the authority of *Broadbent v. Ramsbotham, supra*. The case then went to the Exchequer Chamber, where, in 1857, the judgment below was affirmed, all the judges concurring in the opinion pronounced by Creswell J., with the exception of Coleridge, J., who delivered a dissenting opinion, basing it upon the maxim—*sic utere*, etc. The case then went to the House of Lords, where, in 1859, after solemn argument, the former judgment was re-affirmed by the unanimous opinion of all the judges summoned, and by the House of Lords, with the exception of Lord Wensleydale, who hesitated to sustain in its full extent, the doctrine of the judges.

Wightman, J., speaking for the judges in relation to the right contended for by the plaintiff, says : "It is impossible to reconcile such a right with the natural and ordinary rights of landowners, or to fix any reasonable limits to the exercise of such a right. * * Such a right would interfere with, if not prevent, the draining of land by the owner. Suppose a man sunk a well upon his own land, and the amount of percolating water which found its way into it had no sensible effect upon the quantity of water in the river, no action would be maintainable ; but if many landowners sank wells upon their own lands, and thereby absorbed so much of the percolating water by the united effect of all the wells as would sensibly and injuriously diminish the quantity of water in the river, could an action be maintained against any one of them ; and if any, which ; for no action could be maintained against them joint-

Chase *v.* Silverstone.

ly ? * * The defendant's well is only a quarter of a mile from the river; but the question would have been the same if the distance had been twenty miles, provided the effect had been the same." The opinion cites approvingly *Broadbent v. Ramsbotham*, and *Acton v. Blundel*, and overrules *Dickinson v. Grand Junc. Can. Co.* Lord Chelmsford held the opinion—"the principles which apply to flowing water in streams or rivers * * wholly inapplicable to water percolating through underground strata which has no certain course, no defined limits, but which oozes through the soil in every direction in which the rain penetrates. There is no difficulty in determining the rights of the different proprietors to the usufruct of the water in a running stream. Whether it has been increased by floods or diminished by drought, it flows on in the same ascertained course. * * But the right to percolating underground water is necessarily of a very uncertain description. When does this right commence ? Before or after the rain has found its way to the ground ? If the owner of land through which the water filters cannot intercept it in its progress, can he prevent its descending to the earth at all, by catching it in tank or cistern ? And how far will the right to this water supply extend ?" Lord Cranworth said if the doctrine contended for by the plaintiff should prevail, "it would always require the evidence of scientific men to state whether or not there had been interruption. * * It is a process of nature not apparent; and therefore such percolating water has not received the protection which water running in a natural channel on the surface has always received. If the argument of the plaintiff was adopted, the consequence would be that every well that ever was sunk would have given rise or might give rise to an action."

So, in 1860, in *New River Co. v. Johnson*, 2 E. & E., Q. B., 434, (105 E. C. L.) in an action by the respondent to recover damages (1) for preventing water from percolating underground into her well; and (2), for abstracting from the well, water which had already so percolated into or which was in it. Cockburn, C. J., said : "As to the first ground of complaint, *Chasemore v. Rich-*

*ards* is an express authority that it would not constitute any cause ; and as to the second ground, *Acton v. Blundel* is as plain an authority that no action would have lain in respect of that cause." Wightman, J., expressed similar views, adding that he thought *Chasemore v. Richards*, decisive of both grounds, while Crompton, J., said : "There may be some distinction between a case of water running in a defined stream, and the present case of water merely percolating, as to which *Acton v. Blundel* shows conclusively that no action will lie ; and that the only remedy of the owner of a well from which such water has been abstracted, is to sink the well deeper."

Again in 1863, the subject came before the Queen's Bench, in *Regina v. Metropolitan Board of Works*, 3 B. & S., 708 (113 E. C. L.) A part of the prosecutor's estate was situate upon a deep bed of gravel, imbedded in a basin of clay. In the gravel bed on the lower part of the premises, there had existed from time immemorial, a pond fed by several powerful springs at its bottom ; the water overflowing one edge of the clay-basin, formed a rivulet which ran through the grounds and supplied ornamental ponds therein, and which was used for the cattle and for supplying the garden. The defendants, in constructing a sewer along and under a highway, cut through the gravel bed and basin of clay, at a distance from the prosecutor's premises varying from seventeen to one hundred and fifty-three yards, the immediate effect of which was to prevent the springs there from finding their way into the pond, so that it, together with the rivulet and other ponds, became dry. The judges unanimously held that the case was "in principle not to be distinguished from that of *Chasemore v. Richards*," quoting the paragraph from Justice Wightman's opinion which we have transcribed above, and adding—"we entirely concur in this view of the law, and consider it to be strictly applicable to the circumstances of the present case."

*Chasemore v. Richards* was also recognized as sound law by Cockburn, C. J., and the other judges of the Queen's Bench, in *Hodgkinson v. Ennor*, 4 B. & S., 229, (116 E. C. L.,) decided in 1863.

Again, in 1869, in *Popplewell v. Hodgkinson*, Cockburn, C. J., speaking for all the court, said: "Although there is no doubt that a man has no right to withdraw from his neighbor the support of adjacent soil, there is nothing at common law to prevent his draining that soil, if for any reason it becomes necessary or convenient for him to do so." 4 L. R. Exch. Cas. 251.

This subject has been thoroughly examined in several of the States of this Union, and the doctrine of the English courts adopted. *Frazier v. Brown*, 12 Ohio St. R., 294; *Routh v. Driscoll*, 20 Conn., 533; *Brown v. Illius*, 25 Conn., 593; *Ellis v. Duncan*, 21 Barb., 230; *Wheatley v. Baugh*, 25 Penn. St. R., 528; *Haldeman v. Bruckhardt*, 45 Penn. St. R., 518; *Chatfield v. Wilson*, 28 Vt., 49; *Clark v. Conroe*, 38 Vt., 469.

We are aware that a contrary doctrine has been held by a few of the most learned courts in this country, and among them that of New Hampshire. In *Bassett v. Salisbury Manf. Co.*, 43 N. H., 569, and again in *Swett v. Cutts*, 50 N. H., 439, the subject was most elaborately and candidly discussed, and the cases reviewed. But we feel better satisfied with the reasoning in the cases from which we have made such liberal extracts, and the American cases, which we have simply cited, than with the views expressed by the courts holding the other doctrine; and we see less difficulties in applying the rule of *cujus solum*, etc., than that of *sic utere*, etc., to cases of this character.

The tendency of all the authorities is against the acquisition of a prescriptive right in cases of this nature, and the plaintiff's counsel has abandoned that point.

There is no satisfactory evidence in this case that the injury to the plaintiff's spring was caused otherwise than by a diversion of the underground percolating water, caused by the digging of the defendant's well. There is no evidence of malice on the part of the defendant in the digging or otherwise constructing of his well. Whether or not malice on his part would make any difference in the decision of the case, it is unnecessary for us to consider.

Our conclusion, therefore, is, that the defendant having dug his

well in good faith, for the purpose of obtaining water for domestic uses, is not liable for any damage which incidentally resulted to the plaintiff, by reason of thereby diverting the water which had been accustomed to percolate, or flow in an unknown subterranean current, into the plaintiff's spring.

*Judgment for the defendant.*

APPLETON, C. J., WALTON, DICKERSON, BARROWS and PETERS, JJ., concurred.