THE CITY OF EMPORIA, *et al.*, v. WILLIAM T. SODEN.

1. INJUNCTION; *Jury; Discretion of Court.* In actions for an injunction, neither party is, as a matter of right, entitled to a jury; and where the controversy is between an individual and the public, the court is ordinarily guilty of no abuse of discretion in declining to submit questions of fact to a jury.

2. CITY, *Restrained from Taking Water from Mill-Pond.* S. is the owner of certain mills built on his own land on the banks of the Cottonwood river. These mills are propelled exclusively by water-power obtained by means of a dam across the river. S. purchased, in 1860, the right of flowage of the upper riparian owner, built the dam on his own lands, and has been in quiet and undisturbed possession for nineteen years. In this property he has invested many thousands of dollars. In 1880 the city of Emporia constructed a system of water works for the purpose of supplying the citizens with water for domestic use, for extinguishing fires, and for manufacturing purposes. It purchased a tract of land on the banks of the pond above the dam, dug a well twenty-five feet in diameter and twenty-six feet in depth, on its own land, and from seventy-

five to a hundred feet from the bank of the pond. This well draws its supply of water from the pond by percolation through a bed of gravel at the bottom of the well. It sank one pipe into the well, and another it extended directly into the pond. By means of engines and pumps it supplies the citizens from the well with all water needed for ordinary purposes, and intends to use the pipe in the pond only in case of fire. No condemnation of the water was had, and no compensation made to S. The supply of water in the river is, at certain seasons of the year, inadequate for the running of the mills, and S. is then forced to suspend work and let them stand idle. *Held*, That S. is entitled to an injunction restraining the city from taking water from the pond — either directly through the pipe extending into it, or indirectly by means of the well.

3. UNDERGROUND PERCOLATING WATER, *Use of; Limit.* While the general doctrine in respect to underground water percolating through the soil is, unquestionably, that the owner of the land may appropriate it to any use, and in any amount, and without reference to the effect of such appropriation upon his neighbor's land or supply of water, yet it is limited to this extent, that he may not thus indirectly destroy or diminish the flow of a natural surface stream to the injury of a riparian owner thereof.

## *Error from Lyon District Court.*

INJUNCTION, brought by *Soden* against the *City of Emporia*, the mayor and the council thereof, and Russell and Alexander, partners. The plaintiff alleged that —

"He is now and for more than one year last past has been the owner of certain real estate situated in the county of Lyon, and state of Kansas, lying and being on both sides of the Cottonwood river, including said river and its banks, and described as follows, to wit: Commencing at a corner 17 rods west of a point 64 rods south of the northeast corner of the northwest quarter of section 22, township 19, range 11, thence running south 36 rods, thence west 19 rods to a stake about high-water mark on the west bank of the Cottonwood river, thence north 2° 30' east 36.05 rods, thence east 17 rods to the place of beginning, and other lands joining unto the above described lands and bordering upon said river; that said Cottonwood river is a large, natural watercourse, but not a navigable stream; that for more than eighteen years last past the plaintiff has owned and maintained a mill-dam across said Cottonwood river on his land above described, and a public custom flouring mill, and that during all of that time the plaintiff has dammed and caused the water in said river to flow back so as to form a flowing head of water of from seven

to nine feet above the ordinary stage of water in said river, and during all said time the plaintiff has been in the quiet and peaceable possession, occupation and use of said water, which has during all that time been accustomed to flow along its channel to said mill and dam, freely and unobstructedly and without any let, hindrance or diversion as the said stream has been accustomed to flow from time immemorial; that on the 5th day of November, 1860, and for a long time prior thereto, one Curtis Hiatt was the owner of the east half of the northwest quarter of section 22, township 19, range 11, east, in said county, in fee simple; that on or about said 5th day of November, 1860, by an instrument in writing of that date, duly executed by said Curtis Hiatt and wife, and acknowledged, they granted and conveyed to the plaintiff the right and easement in the last above described real estate, to erect and maintain a mill-dam upon the first above described lands such as was erected and maintained as aforesaid, forever, and the right and easement in the last real estate mentioned and described above to have the said Cottonwood river run and flow over the same for the uses of said mill and water power forever, and the last described real estate then and there became a servient estate to the plaintiff's lands, mill and water power as aforesaid and to the extent aforesaid; that said deed was duly recorded the 9th day of November, 1860, in book C, of deeds, in the office of register of deeds for Lyon county, as aforesaid; that afterward the plaintiff expended large amounts of money in improving said water power and procuring the right of flowage from riparian owners of real estate above and below said mill-dam along said river, and in erecting mills and factories thereon, to the amount of about forty thousand dollars; that all of plaintiff's mills and factories are propelled exclusively by water power from said mill-dam, and are adapted to the use of no other motive power; that said mills and water power and privileges are now of the value of over $80,000; that between the months of April and July, 1880, the defendant, the city of Emporia and its mayor and council, through the defendants Russell and Alexander as their agents and employés, against the positive interdiction of said plaintiff and against his earnest and repeated remonstrances and protests to said mayor and council, in session and out of session, publicly and privately made by plaintiff, did, without any leave, license, warrant or authority of the plaintiff or the law, by condemnation or otherwise, erect and cause to be erected on the bank of the Cottonwood river

on the lands last above described and just above the plaintiff's
said mills and dam and beside the plaintiff's mill-pond, a
Holly system of water works, propelled by steam, with pipes·
connected with the water from the pumps, of one foot in the
bore in diameter, with a system of pipes connected with dif-
ferent parts of the city of Emporia, about eight miles ·in
length; and arrangements are now being made to add four
miles of additional pipes to said system, to be supplied from
said water works, all for the purpose of supplying water for
every purpose for which water works usually supply water
in a city; that the city of Emporia and the additions thereto
now cover nearly or quite two sections of land, and have
thereon about six thousand inhabitants, and are rapidly grow-
ing; that in connection with said water works on the lands
last described, and about fifty feet from the edge of the chan-
nel of the Cottonwood river, the defendants have caused a
well of twenty-five feet in diameter and twenty-six feet deep
to be sunk into the ground eight feet below the water level
in said mill-pond at ordinary stages of water in the pond,
and thereby through the gravel they draw water from the
mill-pond to supply said well, with the water of which well
there is now a connection with pumps by a twelve-inch pipe
through which water is now being drawn for the use of said
city, to the great and irreparable injury of this plaintiff's said
water power and privileges; that defendant, the city of Em-
poria, by its mayor and council, and through said Russell and
Alexander as agents and employés as aforesaid, and without
the leave, license, warrant and authority, and against the re-
monstrances and protests aforesaid, is now engaged in laying
a twelve-inch pipe from said pumps through the last above
described lands far into the plaintiff's mill-pond, for the pur-
pose of further drawing water for the uses of the city, directly
from said mill-pond; that the defendant, the city of Emporia,
designs and intends by the means aforesaid to divert and carry
away large quantities of water from said mill-pond forever,
increasing the same continually as the demand for water shall
increase, without paying the plaintiff for the use of the same,
to the great and irreparable injury of the plaintiff.

· "Wherefore, plaintiff prays that he may have a temporary
injunction restraining defendants and each of them from lay-
ing the said pipes into the said mill-pond pending this suit,
and that at the final hearing that defendants and their success-
ors and assigns be perpetually enjoined from further drawing
water from said well or any other well sunk along said mill-

pond and river above said dam, and that the water works and water pipes connected with said well or river be abated as a nuisance, and for all proper relief in the premises."

Trial by the court at the September Term, 1880, and findings and judgment for the plaintiff. The defendants bring the case here.

*I. E. Lambert, Ross Burns, A. A. Hurd,* and *W. C. Campbell,* for plaintiffs in error:

While we do not contend that the refusal of a court to refer questions of fact to a jury, when properly requested, is always error, still we think it was in this case. For a court to assume the functions of a jury in the face of a request to submit questions of fact, is such an unwarranted invasion of the province of a jury as should not be upheld unless supported by good reasons; and in the absence of such reasons, its subsequent proceedings should be closely scrutinized by a reviewing court. "Correct practice requires that specific and distinct issues of fact should be submitted, that the conscience of the court may be advised by the special verdict responsive to the issues thus made." (Mitford & Tyler's Pl. and Pr. in Eq., p. 463.) In some states it is held that the province of a jury is the same, in general, in cases of equitable as those of legal cognizance. (7 Tex. 587; 8 Ga. 34. See also 38 Me. 423; 6 Paige Ch. 563; 6 Barb. 160; 3 Scam. 496; Angell on · Watercourses, §444, note; Story's Eq. Jur., §925; 44 N. H. 78; 3 Johns. Ch. 282; 21 Wis. 675; 33 Ohio St. 271; Bill of Rights (Kas.), §5; 3 Kas. 432; 5 id. 223; 13 id. 33.)

The city acted under the authority of §60, ch. 100, Laws of 1872; the land condemned for the water works was in a different quarter-section from that owned by Soden; and hence the commissioners made no assessment of damages to his premises. The land so taken for the water works was subsequently conveyed in fee to the city by the owner.

A work authorized by the legislature cannot be adjudged a nuisance, if executed in an authorized manner in an authorized place. (24 N. J. Eq. 49; 28 id. 187, 446; 4 B. & Ad.

30; 25 Vt. 465; 4 N.Y. 195; 21 Wis. 675; Field on Damages, 39.)

It is not claimed that the water works were not erected in an authorized manner, or that the injury complained of was the result of any negligence in their construction. The injury, if any, arises as a necessary and probable result of the act done.

It will be contended that the use by the city of the waters of the Cottonwood river is a *diversion* of the stream, and numerous cases will be cited to show that the diversion of a watercourse by a riparian proprietor to the injury of the proprietor below, is illegal. We take it that the legislature must have contemplated that cities would have to obtain, in many instances, a supply of water from the rivers and creeks of the state. The taking of a necessary supply for a large city from a small stream might deprive a riparian proprietor further down the stream of the necessary amount for his ordinary purposes; but the legislature made no provision for compensating him for such injury, if his land was not actually taken. The injury he sustains is, therefore, *damnum absque injuria;* for the city was pursuing a legal right. (12 Moore P. C. 156; 3 Scam. 496.)

If the use of the water which is made by the city of Emporia is considered an extraordinary use, still it has that right, provided it does not materially lessen the quantity and thereby damage the plaintiff. If the city occupies the same position that a riparian proprietor above does to Soden, then it may use all the water without regard to its effect on him.

But taking the use by the city in this case to be artificial, and what would be a reasonable use of the waters of the Cottonwood river? It would seem to be the actual necessities of its inhabitants. Here, however, the only use of the water of the stream from the time of the erection of the water works until the trial of this case, was on one occasion when a fire occurred in the city. And this the plaintiff himself testifies made no perceptible difference in the flow of water at his mill. The intention of the defendants in laying the pipe from the

well into the river, as appears from a resolution passed May 17, 1880, was simply to provide a supply for fires in case the well should prove inadequate. The testimony of the mayor and councilmen also shows this to be the intention in so making a connection with the river.. What more legitimate or wise use can be conceived of the exercise of the authority given it? At such times, private convenience must yield to public necessity, for *salus populi suprema lex;* and the taking is justifiable even at common law, and is not a taking of private property for public use without due process of law, in the sense of the constitution.

It will be argued for defendant in error that his property is sought to be taken without compensation, as it was never condemned. Our reply is, that a condemnation was not necessary. His property was not taken. If a *natural right* be infringed, he is in no better condition to complain than an owner miles below; and the statute has made provision for compensation to those only whose land is *taken*. No provision is made for damages of a consequential character. The interest affected here, if any, is merely an incident to his property; it is an usufructuary right in the flow of water—a right to partake of a common bounty, as in cases of air, etc., and was never contemplated as a proper subject for the exercise of the right of eminent domain. (7 Barb. 508; 4 N. Y. 195; 25 Vt. 465; 2 Abb. [N. S.] 415.) For such injuries are like those caused by the proximity of a railroad to one's property. The smoke and noise necessary in the proper operation of the road may be annoying, but he has no cause of action therefor; nor can he enjoin a great public work simply to gratify a whim, or because his fastidious tastes were not consulted, and his incidental injuries not first compensated, before the undertaking was commenced.

Neither can it be claimed that the city had not the right to take water from the river because the power is not expressly mentioned; for whenever the end is required the means are authorized, and whenever a general power to do a thing is given, every particular power necessary for doing it is included.

The authority given by the legislature to cities of the second class "to purchase or condemn and hold all necessary lands for water works," and for the erection of the same, would be of little value, did it not carry with it the power to take water for the use of the city. The *taking* of water therefrom is an implied and necessary adjunct to the proper exercise of the power conferred.

It is claimed by defendant in error that "through the gravel they draw water from said mill-pond to supply said well," and such is the finding of fact made by the court below. We assert that the evidence does not support this finding. As to the rules of law in regard to percolating subterranean water: Ever since the leading case of *Acton v. Blundell,* 12 M. & W. 324, the general rule of law has been, that the owner of land can have no action against an adjoining proprietor who, digging a well upon his own land in good faith, nevertheless dries up the well of his neighbor by diverting the underground currents from it. The civil law also recognizes this rule. (Dig., lib. 89, tit. III, § 12.) See also 7 H. L. Cas. 349; 25 Pa. St. 528; 21 Barb. 230; 18 Pick. 117; 27 Conn. 84; 20 id. 533; 62 Me. 175; 28 Vt. 49; 12 Ohio St. 294; 108 Mass. 265.

Counsel for defendant in error may cite the cases of *Bailey v. Woburn,* 126 Mass. 416; *Ætna Mills v. Waltham,* id. 422; and *Ætna Mills v. Brookline,* 127 id. 69, and urge their appositeness to this case. But the court will notice that in each of these cases the city was proceeding under a *special* law, and the complainants were pursuing a statutory remedy.

Each of these actions was for *damages* under the different statutes, and no attempt was made to enjoin the towns from taking the water. If the case at bar was for damages, and our statute was similar to those cited, these cases would be in point, perhaps, under the findings of the court below. But our statute is very dissimilar: compensation is made and damages assessed only to the particular quarter-section or lot of land taken; and no provision is made for damages to property not taken, but which may, nevertheless, sustain conse-

quential injury. If that was the case, it would give every riparian owner, from Emporia to the mouth of the Neosho river, an action for damages.

The grant made by the former owner to Soden to flow back-water on this land, it seems to us cuts no figure in this case. It gives to the plaintiff no other rights. Neither does the fact of an undisturbed use of the river for the period of nearly twenty years. Use does not create nor disuse destroy the rights of the parties in this case. "In analogy to the statute, no presumption can arise against a party on the ground of long enjoyment of a privilege by another, until it is shown that the privilege in some measure interfered with the rights of the party whose grant is proposed to be preserved, and that he had a legal right to prevent such enjoyment by proceedings at law." (25 Pa. St. 534; Angell on Watercourses, § 219c; 62 Me. 183; 3 Taunt. 99; 12 M. & W. 352; 7 H. L. Cas. 349; 7 Exch. 299.)

*Scott & Lynn,* for defendant in error; *Almerin Gillett,* of counsel:

1. The defendant in error having a record title to the water in the river for all the uses and purposes of the water power created by his dam, over the land afterward acquired by the city of Empôria, it took the land subject to his rights. If we are wrong in this, then we claim that having enjoyed this water privilege for nineteen years against the city and its grantors, the law will presume a grant to the defendant in error from some of the early owners of the land, from such long use, and his easement and privileges would, from such appropriation of the water, become as perfect as if a grant of the most ample nature had been made. (37 Ala. 20; 44 Me. 154; 8 N. J. L. 140; 6 Paige Ch. 435; 54 N. H. 122; 3 N. J. Eq. 234; Angell on Watercourses, §§ 203–206, and cases cited.)

2. The defendant in error cannot be deprived of his property in said watercourse, without compensation; and this is true, even though the legislature intended to grant power to cities of the second class to take water under such circumstances

without compensation; for such a law would be in direct conflict with art. XIV of the constitution of the United States, and also with §§ 15 and 18 of the bill of rights of the constitution of Kansas. (See also Kas. Const., art. 12, § 4; 27 Ala. 104; 15 Md. 240; Mills on Em. Dom., § 79; Cooley's Const. Lim. 526, 527, 533, 589.)

3. It cannot be successfully claimed that the condemnation proceedings in this case in any way in the remotest manner looked toward the condemnation of Soden's water rights. We admit that erecting the water-works machinery and laying the pipes were authorized, and that the machinery and the pipes are harmless, and not *per se* a nuisance; but it is taking the water by means of said pipes and machinery without compensation that is not authorized by the legislature, and is a void authority if authorized.

4. Even if the city of Emporia, a corporation, could obtain riparian rights by becoming the owner of the soil—which we deny—it did not become such by owning this soil, for the defendant in error in 1860 purchased the riparian rights thereover. (24 Ala. 130; 29 N. J. Eq. 366; Mills on Em. Dom. § 79.)

5. The *salus populi suprema lex* principle applies to sudden and unforeseen calamities; such as, in time of war, the destruction of private property for the public defense, and in time of fires and plagues, the destruction of private buildings to prevent the spread of the same. It does not authorize the confiscation of a man's house for a yellow-fever or small-pox hospital, or for a fire-engine house for future use, no matter how great the necessity or convenient the building; nor the destruction of private property for public defense in time of peace, but only *flagrante bello*.

6. It is the right of the defendant in error, were he a riparian owner only, that the maxim, *Aqua currit et debet currere, ut currere solebat,* should be applied, irrespective of the use which he makes of the water. (18 Kas. 25; 2 Story, 661; 3 Rawle, 84; 10 Conn. 213; 9 Pa. St. 74; 37 Cal. 282; 50 Barb. 316; 24 N. H. 364; 4 Ill. 492; N. J. L. 460; 2 Dev.

& B. 50; 6 Ind. 324; 1 G. Greene, 348; 25 Me. 209; 14 N. J. Eq. 335; 1 id. 157; 28 Vt. 459; 3 Pick. 269.)

The defendant in error has not only the natural rights of a riparian owner, but also the rights which have accrued to him by appropriation and use of all the waters that naturally flow in said stream to his mill-dam to the full height of his dam and the capacity of his mill-pond. (4 Mason, 397; 16 Pick. 241; 2 Kernan, 381–392; 25 Me. 209; 44 id. 154; Angell on Watercourses, §§ 134, 135.)

7. The defendant in error does not rely upon natural rights alone, for he has also acquired rights both by grant and by appropriation and long adverse user, upon all of which he relies for his injunction; but even if he had no more right than any riparian owner above or below him, he would be entitled to an injunction whether he was damaged or not, lest by continued diversion for a long period it would grow into a right. (4 Kas. 515; 11 id. 580; 12 Me. 407; 8 Cush. 595; 3 Sumn. 189; 16 Pick. 241; 10 Wend. 260; 17 Conn. 402; 9 N. H. 88; 1 Rawle, 27; 1 Gilm. 551.)

8. It is argued that the city had the power to take Soden's water without compensation, although no direct power to do so is conferred by statute; and that this power must be inferred from the power granted to construct and erect water works. It is claimed that the power to construct water works would be of no avail without the power to take water from the owner, *nolens volens.* Counsel for the city forget that the privilege to take water is a matter of negotiation, of bargain and sale, like any other property, and that a city may acquire the right by a more honest means than confiscation. This is what we think the legislature meant—that the water should be purchased or condemned. Taking water any other way is unconstitutional. A statute should never be construed, for this reason, as authorizing the taking of water without compensation; for such construction would make the statute void, and the maxim, *Ut res magis valeat quam pereat,* should be applied. (24 Ala. 130; Broom's Legal Maxims, p. 4, and cases there cited.)

9. That the water was diverted from the mill-pond of defendant in error, admits of no sort of doubt. The court below in its fifteenth finding found "that said well draws its supply of water from plaintiff's mill-pond." If there is any evidence to support this finding, it is conclusive in this court.

10. The city claims that the water comes into the well by percolation through the soil and along no known and defined channel, and that the well is dug on its own land, and therefore if Soden is injured thereby, it is *damnum absque injuria.*

We join issue as to the facts and the law. The water did not come into the well by percolation through the soil, or as the courts term it, it did not "ooze," "filtrate" or "soak" through the soil, but came in in large, distinct and well-defined veins or streams, and not through any soil, but through the large crevices afforded by throwing loosely together a stratum, two feet in depth, of large-sized stones unmixed with earth or soil. As to the law: Even though the water comes into said well by a subterranean stream flowing through the soil, still the plaintiffs in error would be liable for a diversion of the waters of said river. (29 Pa. St. 59; 25. id. 528; 1 Sawyer, 470; 6 Paige's Ch. 433; 1 Story, 387; 43 N. H. 569; 56 id. 439; 1 Camp. 463; 7 Exch. 282; 1 H. & N. 627–630; 4 B. & S. 239; Goddard on Easements, 248; Angell on Watercourses, §§ 112a, 112b.)

There are only a few cases in the reports in which the question of diverting water from a natural watercourse by diverting an underground stream has been decided. One is the case of *Chasemore v. Richards,* 7 H. L. Cas. 340, (also reported in 2 H. & N. 186.) In this case the facts found were, that no water whatever was *abstracted* from the river Wandle, but only that the defendants had sunk a well on their own land, a long distance from the river, where the soil was porous, and had thereby cut off some of the supplies of water which, through underground currents and percolation, had theretofore run *into* the river Wandle, and said water was diverted through said well *before* the same had ever reached or become a part of the natural watercourse, the river Wandle.

In the case of *Dickinson v. Grand Junction Canal Co.,* 7 Exch. 282, there were two propositions decided: One was, that diverting water from a natural watercourse by abstracting the same therefrom by means of a well, through an underground current, is actionable; and the other proposition was, that the diversion of an underground current which empties into a natural watercourse is also actionable. The case of *Chasemore v. Richards,* supra, has overruled the last proposition decided in *Dickinson v. Grand Junction Canal Co.;* but the first proposition decided stands unchallenged in England or America. This seems to be the distinction made by the courts, that a surface stream, with a well-defined channel, is a watercourse that cannot, according to all authorities, be diverted; and that it makes no difference whether the diversion of such a surface stream is made through a surface channel or through a sub-surface channel; for in both cases the water is equally abstracted from a natural watercourse, which is a wrong that is actionable. On the other hand, to cut off a vein of water *before* it reaches the natural surface watercourse, would only be a diversion of water before it becomes a part of the natural watercourse by running into the surface stream.

Washburn, in his work on Easements, p. 449, says: "On the other hand, if there be a diversion of the waters of a stream by any land-owner within his own premises, to the injury of the lower proprietor, it matters not that it is done by digging a well into which the water is diverted," etc.

In the case of *The Village of Delhi v. Youmans,* 45 N. Y. 362, the distinction is clearly made between the two cases. It is decided: "An action will not lie against an owner of land, who in digging a well upon his own premises, intercepted the percolation or underground currents of water, and thereby prevented their reaching the springs or open running stream on the soil of another. *The rule is different when the water has actually reached and become a part of the spring or stream, and is abstracted from it.*"

Mr. Justice Crompton, in *New River Co. v. Johnson*, 2 Ellis & Ellis, 444, makes the same distinction.

Upon this ground, the cases of *Bailey v. Woburn*, 126 Mass. 416; *Ætna Mills v. Waltham*, 126 id. 422; *Ætna Mills v. Brookline*, 127 id. 69; *C. S. M. Co. v. V. & G. H. W. Co.*, 1 Sawyer, 470, and *Arnold v. Foot*, 12 Wend. 330, are reconcilable with all the cases.

11. The plaintiffs in error were not entitled to a jury trial. This is not a case for the recovery of money, nor specific real or personal property, nor a criminal case; but an ordinary equity proceeding for an injunction. (17 Kas. 433; 19 id. 396; 3 id. 415.. See also 18 Kas. 256; 15 id. 497.)

The opinion of the court was delivered by

BREWER, J.: This case presents some questions which are new in the history of this state, and upon which, indeed, few authorities can be found anywhere. The facts are these: Soden is the owner of some mills, built on his own land, on the banks of the Cottonwood river. These mills are propelled exclusively by water power. To secure this power Soden erected and maintains a dam, which raises the water some seven or eight feet, and makes above the dam quite a pond. The mills are of great value, having cost many thousands of dollars. Soden's title to this water power is clear and full. He has used and maintained it for nineteen years. He owns the land upon which the dam is built, and purchased and obtained a conveyance from the upper riparian owner of the right of flowage. This conveyance was executed and recorded in 1860. In 1880, the city of Emporia, a prosperous city of 5,000 inhabitants, constructed a system of water works for the purpose of supplying its citizens with water, and purchased a tract of land adjoining and above the mill property and extending to the center of the river. On this land, and from seventy-five to a hundred feet from the bank of the river, it dug a well twenty-five feet in diameter and twenty-six feet in depth. The court found that this well drew its supply of water from the plaintiff's mill-pond. Into the well it sank

one pipe, and another it ran into the mill-pond. The latter, however, it intended to use only in case of fire, depending on the former for the ordinary supply of the city. Soden duly warned the city not to attempt, directly or indirectly, to take water from his mill-pond. No condemnation of the water, and no arrangement with Soden, were ever made. Whereupon Soden brought this action, and obtained an injunction in the district court restraining the city from taking water from the pond or well. To reverse such judgment, this proceeding in error has been brought.

With this general statement we proceed to consider the specific errors alleged. And first, it is insisted that the court erred in refusing a jury. This was an action of injunction, an equitable action, and neither party had a right to a jury. Of course in such an action questions of fact may arise, and the court has power to submit those questions to a jury, but neither party has a right to a jury. Whether one shall be called or not, rests in the discretion of the court. (*Hixon v. George*, 18 Kas. 256; *Carlin v. Donegan*, 15 Kas. 496.) And generally, in a case like this, we think the wiser course is to refuse a jury. An individual has a dispute with a community. A jury will naturally gravitate towards the majority. Its sympathies are with the many, and against the individual. Then, generally, a court does well in declining to submit questions of fact to a jury, and in assuming the full responsibility of the decision. In this case it may be remarked that the learned judge is himself a citizen of Emporia. So far as sympathy and interest may affect the judgment, his would naturally be with the city. For eight years he has been the honored and respected judge of that district. Many cases have come to this court from his decisions, and we have had repeated occasion to notice his fairness and candor. We desire to place upon record our unqualified approval of his con. uct and ruling in cases like this, where many a weaker and less brave man would have avoided the responsibility which fairly belongs to a judicial office.

The next question to be considered is one of fact, and that

is, Whether this well draws its supply of water from the mill-pond of plaintiff? Of course there are two allegations in the petition — one, of the direct abstraction of the water in the mill-pond by the pipe placed in it; and the other, of the indirect abstraction by the well. The former, according to the testimony, is to be resorted to only in case of fire; at least, that is the present intention of the city officers. The latter is denied, and as a question of fact, is to be determined by the evidence. The finding in this respect was against the city, and that the well draws its supply of water from the pond by percolation through a bed of gravel at the bottom; and upon the testimony this finding must be sustained. We may have something to say hereafter as to the character of the evidence by which such a fact is sought to be established. For the present, it is enough to say that there was testimony clearly tending to establish it. The proximity of the well to the bank of the pond suggests that the latter is the source of its supply. The rapid rise of water in it — one foot in thirty-seven minutes — confirms this. At the bottom of the well is a stratum of gravel, which appears also in the river. In digging the well, no water was found till this bed of gravel was struck, and then it flowed in in streams. The water, as admitted by one of the defendants, rises and falls with the rise and fall of water in the pond. While the pumps ordinarily keep the water in the well below the level of the pond, yet, if they are stopped, it slowly rises to the same level. These are facts which, if they do not compel, certainly justify the finding of the court. It is true that the water reaches the well by percolation though this bed of gravel, and not by flowing in a distinct channel. The effect of this upon the legal right of the parties will be considered hereafter. It may be conceded also that it is not shown that the pond is the only source of supply to the well. Witnesses speak of water coming into the well from a direction opposite to that of the river, and it may be that hidden springs, subterranean streams, unknown sources, contribute to the supply.

For the present, and to determine the legal rights of the

parties, we shall assume that in case of fire the water will be taken directly from the mill-pond by means of the pipe running into it, and that generally the supply of water in the pond will be reduced by means of the indirect abstraction through the well, and the subsequent transmission through the streets of Emporia for the accommodation of its citizens. Has the plaintiff any remedy for this direct and indirect abstraction of water, and consequent diminution in amount of power? The amount of water now used by the city and its present effect upon the plaintiff's business do not determine the question of right or remedy. The continuance of the water works, as well as the growth of the city, will increase the demand; and, if the present abstraction can be sustained, there is no legal principle upon which the future and larger abstraction can be restrained. Now, that the flow of water in the natural channel of a surface stream is a property right of the riparian owner, is unquestioned and familiar law. (*Shamleffer v. Mill Co.*, 18 Kas. 24.) If an individual should, by digging a new channel a few hundred feet above Soden's dam, attempt to divert the flow of the stream, beyond doubt he would be restrained. And this restraint would be granted, not because of the mere fact of digging a channel, but because thereby the natural flow of the stream was prevented; not because of the manner, but because of the fact of the diversion. The restraint would be granted as readily if the abstraction was by pipes and pumps, as if by channel and a change of current. The principle is this: That whatever of benefit, whether of power or otherwise, comes from the flow of water in the channel of a natural stream, is a matter of property and belongs to the riparian owner, and is protected in law just as fully as the land which he owns. It cannot be taken for private use except by his consent, and for public use only upon due compensation.

With these general and conceded principles, let us now inquire as to the validity of the grounds upon which the action of the city is sought to be justified. The fact is obvious, that by means of the pipe running into the pond, there will be in

case of fire a direct abstraction of water, and the fact is found that by means of the well there is an indirect abstraction. The flow of water is, as heretofore stated, thus interfered with and the power diminished. It is in evidence that while at certain seasons of the year the water supply is more than enough for all of plaintiff's present uses, and that during such seasons the consumption of water in the city would work no present injury, yet at other seasons the supply is insufficient, and some, or all, of his mills are compelled to stop running. Hence, naturally, any abstraction of the water would tend to increase the time during which his mills must be idle, and therefore work present and positive injury—an injury increasing with the increasing consumption by the city. Further, if plaintiff is entitled to this water power at all, he is entitled to all of it, and may increase the number of mills, or amount of machinery propelled by it, until his uses shall wholly exhaust it. So that matters of amount really fade out of sight, and the question is one of right and title.

The city defends its action upon three grounds. First, as to the pipe running into the pond and the water thus taken therefrom, that such use is intended in cases of fire only, and that then "*salus populi suprema lex*" controls. As, in case of fire, the general safety justifies the destruction of one building, to prevent the spread of fire and the ruin of all, so such emergency will justify the appropriation of even the entire flow of any river. We do not doubt that emergencies may arise which justify the most extreme measures, and that in such emergencies the individual must suffer for the needs and protection of the public. But it is not every fire that creates such an emergency. An isolated building on fire endangers little or nothing. Yet to save somebody's barn, whose burning endangers no other building, the city proposes to take from plaintiff some portion of the power necessary for the running of his mills. Is this not very like robbing Peter to pay Paul? May the city take one man's property to prevent another man's loss? Doubtless the public owes to the individual the duty of reasonable effort to prevent destruction by

fire, but such duty does not compel premeditated and uncompensated appropriation of private property. The public may justify the destruction of one building by powder, to save many buildings from destruction by fire; but the possibility of such an emergency will not authorize the public to take possession of every individual's cellar and turn it into a powder magazine, so as to be ready for the emergency.

A second matter of defense is this: While the undiminished flow of the stream is conceded to be the right of every riparian owner, yet this right has always been limited to this extent, that each riparian owner may, without subjecting himself to liability to any lower riparian owner, use of the water whatever is needed for his own domestic purposes and the watering of his stock. The city is a riparian owner, and, whether it uses little or much, it is simply taking for domestic purposes. Each individual citizen of Emporia may buy land on the banks of the river and then take for domestic uses whatever amount of water he needs. What the individual separately may do, the city, representing all the individuals, has done. Does the manner in which the result was accomplished make any difference in the right?

This argument is plausible, but not sound. A city cannot be considered a riparian owner within the scope of the exception named. The amount of water which an individual living on the banks of a stream will use for domestic purposes, is comparatively trifling. Such use may be tolerated upon the principle *de minimis non curat lex*. It is a use which must always be anticipated, and may reasonably be considered as one of the benefits of the ownership of the banks of a natural stream. Every one proposing to utilize the power of running water should reasonably expect that the stream is chargeable with such a slight burden. It is only a fair equalization of rights. But the taking of water for the supply of a populous and growing city, stands upon an entirely different basis. No man can foresee this; and if it were tolerated, no one would dare to expend money in utilizing this power for fear of its being soon taken from him without compensation, and with

total loss to his investment. The city, as a corporation, may own land on the banks, and thus in one sense be a riparian owner. But this does not make each citizen a riparian owner. And the corporation is not taking the water for its own domestic purposes; it is not an individual; it has no natural wants; it is not taking for its own use, but to supply a multitude of individuals; it takes to sell. Again, the statute under which the city is acting (Comp. Laws 1879, p. 997, § 1) authorizes the taking of water "for the purpose of supplying the inhabitants of such cities with water for domestic use, the extinguishment of fires, and for manufacturing and other purposes." It would be strange if the city could destroy plaintiff's water power without compensation, and then sell it to other manufacturers, and thus build up rival establishments. This same question was before the supreme court of Alabama, and in a well-considered case the same conclusion was reached. We quote from the opinion in that case:

"It is insisted, however, that the fact that the city of Mobile owned land on the creek, upon the point where the mill of the defendant in error was located, gave to that corporation the right to the use of the water in sufficient quantities to supply the domestic purposes of its inhabitants. That a riparian proprietor has the right to consume even the whole of the water of a stream, if absolutely necessary for the wants of himself and family, has received the sanction of judicial decision. (*Evans v. Merriweather*, 3 Scam. 496; *Arnold v. Foot*, 12 Wend. 330.) But if this doctrine be correct, it can have no application in the present instance, because it rests upon reasons which are wholly inapplicable to corporations, which are artificial bodies, and can have no natural wants. There are, however, other considerations which would forbid the extension of this rule to the case before us. The city of Mobile is not located upon the creek; it is from three to five miles distant. To hold that a municipal corporation can, from the mere fact of owning land upon a watercourse, acquire the right to divert the water in sufficient quantities to supply the domestic wants of its inhabitants, residing at a distance of from three to five miles, to the injury of other proprietors, would be unreasonable in itself and unjust to those who have an equal right to participate in the benefits

of the stream." (*Stein v. Burden,* 24 Ala. 130. See also *Garwood v. N. Y. C. & H. R. Rld. Co.,* N. Y. Court of Appeals, 23 Alb. L. J., p. 215.)

A final matter, applicable solely to the well, and the most serious and difficult question in the case, is, that as the water enters only by percolation through the soil, the law will permit no inquiry into the sources of supply, or the effect of such percolation upon the quantity of water in any other tract of land. It is doubtless true, as a general proposition, that the law takes no cognizance of percolating water. The impossibility of proving with reasonable certainty the sources of supply, is a strong if not the principal reason therefor. But upon whatever founded, the doctrine may be considered settled. Chief Justice Chapman, in delivering the opinion of the court in the case of *Wilson v. New Bedford,* 108 Mass. 265, says: "The percolating water belongs to the owner of the land as much as the land itself, or the rocks and stones in it; therefore he may dig a well, and make it very large, and draw up the water by machinery or otherwise, in such quantities as to supply aqueducts for a large neighborhood. He may thus take the water which would otherwise pass by natural percolation into his neighbor's land, and draw off the water which may come by natural percolation from his neighbor's land." See also the following cases: *Acton v. Blundell,* 12 M. & W. 352; *Chasemore v. Richards,* 7 H. L. Cas. 349; *Wheatley v. Baugh,* 25 Pa. St. 528; *Ellis v. Duncan,* 21 Barb. 230; *Greenleaf v. Francis,* 18 Pick. 117; *Brown v. Illins,* 27 Conn. 84; *Chase v. Silverstone,* 62 Me. 175; *Chatfield v. Wilson,* 38 Vt. 49; *Frazier v. Brown,* 12 Ohio St. 294; *Roath v. Driscoll,* 20 Conn. 532. Does this case furnish an exception to or limitation upon this doctrine?

It is also a general proposition, that a man may not do indirectly what he may not do directly. Unquestionably, a party may not run pipes into plaintiff's mill-pond, or dig a channel to it and thus divert the water. May he accomplish the same result by digging a well upon the very banks, and so near thereto that the water oozes out from the pond into

the well, and be beyond the reach of the law so long as he keeps a wall of earth between the well and the pond?   If this were recognized as law, protection to the owners of water power would rest on slender foundations.   Often the banks of a stream are composed of very porous soil; or it may be there is, as in this case, a bed of gravel through which the water runs as through a sieve.   Is the owner of the pond, then, at the mercy of any one who, avoiding the more direct and public method of pipe or channel, resorts to the equally effective means of adjacent wells?   And if a well on the very bank would be restrained, may the same result be accomplished by digging one a few feet off?   It would seem as though but one answer could in justice be given — that the owner of an established power is entitled to protection against any subtraction therefrom, whether sought to be accomplished by direct or indirect methods.   We are aware that the further the well is removed from the bank of the stream, the more difficult and uncertain the evidence of the abstraction of the water; but when the fact of the abstraction is proved, it would seem that relief must necessarily follow.   It is a matter of common knowledge that water, passing through but a narrow passage and finding at the end an outlet, soon increases by its flow the size of the passage; and thus, that which at first was but a mere trickle, becomes in time a sizable stream, and the abstraction which at first was limited, soon increases, until it may eventuate in a general exhaustion.   Of course, the mere proximity of the well to the stream does not prove the abstraction — there may be other and subterranean sources of supply, and he who alleges the abstraction has the burden of proof; and if he fails to establish the fact, he fails to show a right to relief, and if he asks compensation for the abstraction, he can recover only for the amount which he is able to prove.   Here the fact is found, and upon that finding plaintiff is entitled to relief.

Authorities, as was stated in the outset of this opinion, are. few; but those most directly in point sustain the views we have expressed.   The case of *Dickinson v. Canal Co.*, 7 Exch.

280, was decided in 1852. In this case it appeared that defendant had dug a well, out of which it pumped water to supply its canal. The effect of this was to intercept water which theretofore percolated through the ground into the river Bulbourne, and also to abstract from said river a portion of the water which had already entered into and become a part of the stream. The plaintiffs, the owners of certain mills propelled by the water power of said river, brought their action, and it was held maintainable on both grounds. In 1859, the case of *Chasemore v. Richards* was decided in the house of lords. (7 House of Lords Cases, 348.) This case overrules *Dickinson v. Canal Co.*, so far as respects the interception of water percolating toward and into the stream, but leaves unquestioned the other ground, that of the abstraction of water from a natural stream. The facts were these: Plaintiff was the owner of a mill propelled by the water power of the river Wandle. The defendant, for the purpose of supplying the town of Croydon with water, dug a large well on ground belonging to the town, and about a quarter of a mile from the river. Out of this from 500,000 to 600,000 gallons were daily pumped. The effect of this was to intercept underground water in the vicinity of the well, which theretofore had percolated through the soil toward and into the river Wandle, and thus diminished the supply of water and amount of power in the river. It was held that the action could not be maintained. The opinions announced in that case (and five are reported) are interesting and instructive. All concurred in the judgment, though Lord Wensleydale evidently did so with reluctance. All rest upon the general thought that there is so much uncertainty as to the direction and flow of underground water which has not assumed the form of a distinct, definite subterranean stream, that to attempt to apply the settled law as to surface streams would cause great confusion, and tend to prevent drainage and improvement of lands. There is in some of the opinions a distinct concession that no natural, definite stream, surface or subterranean, can be interfered with. The chancellor, Lord Chelmsford,

says: "I agree with the observation of Lord Chancellor, Baron Pollock, in *Dickinson v. Grand Junction Canal Co.*, 'that if the course of a subterranean stream were well known, as is the case with many which sink underground, pursue for a short space a subterraneous course, and then emerge again, it never could be contended that the owner of the soil under which the stream flowed could not maintain an action for the diversion of it, if it took place under such circumstances as would have enabled him to recover had the stream been wholly above ground.'" And certainly nowhere in the case is any attempt made to deny protection to any established and definite natural stream against the abstraction, direct or indirect, of its waters. In the subsequent case of *Grand Junction Canal Co. v. Shegar*, reported in 6 Ch. Ap. Cases, 487, it appeared that a local board of health had by its drains drawn off a subterranean spring, and also water from a running stream. In sustaining an injunction, Lord Hatherly said: "I do not think *Chasemore v. Richards* has decided more than this, that you have a right to all the water which you can draw from the different sources which may percolate underground; but that has no bearing at all on what you may do with regard to water which is in a defined channel, and which you are not to touch. If you cannot get at the underground water without touching the water in a defined surface channel, I think you cannot get at it at all. You are not, by your operations, or by any act of yours, to diminish the water which runs in the defined channel, because that is not only for yourself, but for your neighbors also, who can have a clear right to use it and have it come to them unimpaired in quality and undiminished in quantity."

The three cases of *Bailey v. Woburn*, 126 Mass. 416, *Ætna Mills v. Waltham*, 126 Mass. 422, and *Ætna Mills v. Brookline*, 127 Mass. 69, are instructive. In each of these cases the town had constructed a water gallery near the banks of the river. In the first case it appeared that connection between the gallery and the river was made by pipes and conduits; in the second, the water passed into the gallery

through an artificial embankment, while in the third, it sim-
ply passed in by percolation through the natural soil.   In
each case this was adjudged a taking of the water of the
river, for which damages could be recovered under the
statute.   In the last case the court notices the distinction
between appropriating by well or otherwise that which is
merely underground and percolating water, and diverting
from a natural stream by means of an adjacent well, and
clearly intimates that the last cannot be permitted.

In the case of *The Village of Delhi v. Youmans*, 45 N. Y.
362, the defendant dug a well on his own land, whereby
water was drawn away from plaintiff's land.   Peckham, J.,
for the court says: "If the action of the defendant took the
water away from the springs after it had reached there, after
it had become part of an open running stream, then this
action would lie."

In *Pixley v. Clark*, 35 N. Y. 520, a different question was
presented, but one which shows that the percolation of water
may be the subject of judicial inquiry, notwithstanding the
difficulties in the matter of proof.   In that case the defend-
ant built a dam across a stream, which raised the water so
that it percolated through the natural bank and saturated an
adjacent field, and it was held that he was liable for the
damages.   See also *Rawstron v. Taylor*, 33 Eng. L. & Eq.
428; *Broadbent v. Ramsbotham*, 34 Eng. L. & Eq. 553;
Goddard on Easements, 248; Washburn on Easements, 449;
*Dexter v. Providence Aqueduct Co.*, 1 Story, 387; *Col. Silver
Mining Co. v. Virginia & Gold Hill Water Co.*, 1 Sawyer,
470; *Bassett v. Salisbury Manfg. Co.*, 43 N. H. 569; *Wheat-
ley v. Baugh*, 25 Pa. St. 528; *Whetstone v. Bowser*, 29 Pa.
St. 59.

Our conclusion then is, that the judgment of the district
court was correct, and must be sustained.   Before the city
can destroy or diminish the water power of Mr. Soden, it
must make compensation.   We think the statute under
which the city was proceeding broad enough to include the
condemnation of water; so that, if the parties cannot agree,

Cornell v. St. L. K. & A. Rly. Co.

proceedings may be had for a condemnation, and in such proceedings plaintiff can recover compensation for such injuries as he is able to prove.

The judgment will be affirmed.

All the Justices concurring.