## The Ocean Grove Camp Meeting Association

*v.*

## The Commissioners of Asbury Park.

The complainants bored in their own land for water over four hundred feet, and procured a flow of fifty gallons per minute at an elevation of twenty-eight feet; the defendants then sank a shaft on the land of strangers, but, by consent, to a depth of only eight feet less than complainants' and about five hundred feet therefrom, and obtained thirty gallons per minute. When the defendants' well began to flow the complainants' diminished to thirty gallons per minute. The defendants propose to sink other shafts still nearer to complainants'—*Held*, that an injunction will not be granted either to restrain the defendants from sinking other wells, or to command them to close the one already sunk.

*Mr. R. Ten Broeck Stout*, for complainants.

*Mr. D. Harvey, Jr.*, and *Mr. J. F. Hawkins*, for defendants.

BIRD, V. C.

More than fifteen years ago the complainants purchased a large tract of land fronting upon the ocean, chiefly for the purposes of a summer resort to exercise the right of worship. The enterprise has so grown that in winter it has a population of about five thousand, and in summer of ten thousand or fifteen thousand. The authorities soon discovered that to preserve the good health of the residents and visitors it was absolutely necessary to improve their water-supply and sewerage system. To do this they bored for water, and at the depth of over four hundred feet struck water which gave them a flow of fifty gallons per minute, at an elevation above the surface of twenty-eight feet. This they carried into the city by means of pipes, and supplied therewith about seventy hotels and cottages. They also applied it to the improvement of their sewerage system. The volume of water thus produced continued to flow undiminished in quantity and with unabated force until the action of the defendants now complained of, and to restrain which the bill in this cause was filed.

The commissioners of Asbury Park, a corporate body, purchased a large tract of land immediately north and adjacent to the tract owned by Ocean Grove. Under their management this, too, has become a famous seaside resort. Its population is equal to, if not greater, at all times, than that of Ocean Grove. The authorities saw a like necessity for an increased supply of wholesome water. They entered into a contract with others, a portion of these defendants, to procure for them water by boring in the earth. These, their agents, sank several shafts to the depth of over four hundred feet without satisfactory success. One shaft yielded about four gallons to the minute, and another, which yielded the most, only nine. All of these wells were upon the land and premises of the Asbury Park Association. It became evident, and is manifest to the most casual observer, that these wells would not supply the volume of water needed. It was also manifest that the experiment to procure water by digging upon their own land had been quite reasonably extended, although not so complete as to satisfy the mind that they cannot obtain water

on their own premises as well as elsewhere, since it is in evidence that there are two wells on their premises, sunk by individuals, which produce fifteen gallons each per minute, being as much in quantity as they procure from the well which is complained of.

Failing in their efforts upon their own premises they go elsewhere, on the land owned by individuals, and, procuring a right from individual owners, sink a shaft upon the public highway, near to the land of the complainants, and within five hundred feet of the complainants' well. This bore extended to the depth of four hundred and sixteen feet, within eight feet of the depth of complainants' well. At this depth they secured a flow of water at the rate of thirty gallons per minute, and the supply from the complainants' well was almost immediately decreased from fifty gallons to thirty per minute. The diminution in water was immediately felt by many of those who depended for a supply from this source in Ocean Grove.

The Asbury Park authorities propose to sink other wells still nearer the well of the complainants. This bill asks that they may be prohibited from so doing, and that they may be commanded to close the well already opened, which, it is alleged, is supplied from the same source that the complainants' well is supplied from.

The complainants are first, in point of time. They are upon their own land and premises. They procure water from their own soil to be used in connection with their said premises, in the improvement and beneficial enjoyment of their occupation.

In this they have exercised an indefeasible and unqualified right. It matters not whether the water which they obtain is from a pond or underground basin, or only the result of percolation, or from a flowing stream. The defendants went from their own land upon the land of strangers, and obtained permission to bore for water, and there sink their shaft, procuring water from the same source that the complainants procured their water, and diverted it and carried it to their premises, three-eighths of a mile, for use.

Can they be restrained from doing this? A very careful con-

sideration of a great many authorities leads me to the conclusion that they cannot at the instance of the complainant. *Angell on Water Courses* §§ *109–114 inclusive; Gould on Waters* § *280; Ballard* v. *Tomlinson, L. R. (26 Ch. Div.) 194; Chasemore* v. *Richards, 7 H. L. Cas. 349; 5 H. & N. 982; Acton* v. *Blundell, 12 M. & W. 324; Chase* v. *Silverstone, 62 Maine 175; Roath* v. *Driscoll, 20 Conn. 533; Delhi* v. *Youmans, 45 N. Y. 362; Goodale* v. *Tuttle, 29 N. Y. 459; Wheatley* v. *Baugh, 25 Penna. St. 528; Frazier* v. *Brown, 12 Ohio St. 294.*

The courts all proceed upon the ground that waters thus used and diverted are waters which percolate through the earth, and are not distinguished by any certain and well-defined stream, and, consequently, are the absolute property of the owner of the fee as completely as are the ground, stones, minerals or other matter to any depth whatever beneath the surface. The one is just as much the subject of use, sale or diversion as the other. The owner of a mine encounters innumerable drops of water escaping from every crevice and fissure; these, when collected, interfere with his progress, and he may remove them, although the spring or well of the land-owner below be diminished or destroyed. So, the owner or owners of a bog, marsh or meadow may sink wells therein, and carry off the water collected in them, to the use or enjoyment of a distant village or town, although the waters of a large stream upon the surface be thereby so diminished as to injure a mill-owner who had enjoyed the use of the waters of the stream for many years. Upon these principles there can be no doubt but that every lot-owner in Ocean Grove or Asbury Park could sink a well on his lot to any depth, and, in case one should deprive his neighbor of a portion or all of his supposed treasure, no action would lie. A moment's reflection will enable everyone to perceive that such conditions or contingencies are necessarily incident to the ownership of the soil.

In the case before me there is no proof that the waters in question are taken from a stream, and I have no right to presume that they are. The presumption is the other way.

It seems to be my very plain duty to discharge the order to show cause, with costs.