FRANK W. MEEKER, PLAINTIFF IN ERROR, v. CITY OF EAST ORANGE, DEFENDANT IN ERROR.

Argued March 11, 1909—Decided November 15, 1909.

1. The "English rule" as to property-rights in percolating underground water rejected. The doctrine of "reasonable user" adhered to.

2. A landowner has not an absolute and unqualified property in all water that may be found percolating in his soil, to do what he pleases with it, as with the sand and rock that form part of the soil; his right is to use such waters only in a reasonable manner and to a reasonable extent for his own benefit, as in agriculture, irrigation, manufacturing, domestic consumption, and the like, and without undue interference with the rights of other landowners to the like use and enjoyment of waters percolating beneath their land, or of water-courses fed therefrom.

3. The defendant, a municipal corporation, for the purpose of supplying its inhabitants with water, acquired a tract of land and sank thereon a number of artesian wells, through which it drew out percolating underground water which, but for its interception, would have reached a spring, stream and well upon plaintiff's land, and also withdrew percolating underground water from beneath the surface of his land to such extent as to damage his crops. *Held*, actionable.

4. Percolating underground waters may not be withdrawn for distribution or sale if it therefrom result that the owner of adjacent or neighboring land is interfered with in his right to the reasonable user of sub-surface water, or if his wells, springs or streams are thereby materially diminished in flow, or his land rendered so arid as to be less valuable for agriculture, pasturage or other legitimate uses.

On error to the Supreme Court, whose opinion is reported in 47 *Vroom* 435.

For the plaintiff in error, *Ralph E. Lum* (*Guild, Lum & Tamblyn,* on the brief).

For the defendant in error, *Jerome D. Gedney.*

The opinion of the court was delivered by

PITNEY, CHANCELLOR.    Plaintiff brought two actions in one of the District Courts of the city of Newark to recover damages for the diversion by the defendant of percolating underground water.   In each case the District Court rendered judgment in favor of the defendant, and upon appeal to the Supreme Court the judgments were affirmed.   By writs of error the records are brought here for review.

The cases were submitted to the trial court upon agreed statements of fact.   In one case it is stipulated that plaintiff owns and occupies a farm of about one hundred acres, situate in the valley of Canoe Brook, in the townships of Millburn and Livingston, in the county of Essex.   He is a milkman, and has for a number of years used his farm for the pasture and support of his cows and horses.   Canoe Brook and two small streams tributary thereto flow through his farm.   Upon the farm there is also a spring, enclosed by a spring-house, the water of which has for years been used by the plaintiff for drinking purposes and for the storing and keeping of his milk.   His cattle in pasture have for years resorted to the brook and its tributaries for drinking water.   The defendant, the city of East Orange, under the authority of "An act to enable cities to supply the inhabitants thereof with pure and

wholesome water," approved April 21st, 1876, and the acts supplemental thereto and amendatory thereof (*Pamph. L., p.* 366; *Gen. Stat., p.* 646), acquired a tract of land containing about six hundred and eighty acres, situate in the valley of Canoe Brook and in the township of Millburn, and installed thereon a water plant consisting of about twenty artesian wells, situate further down the stream than plaintiff's farm and distant upwards of a mile therefrom. In the construction of these wells, and of the works, mains and reservoirs connected therewith, the city has expended more than $1,000,000. A few years prior to the commencement of the action the city began to take water from the wells, and has thus taken percolating underground water which, but for its interception, would have reached the plaintiff's spring or stream. No water other than percolating water has been taken, and no water has been taken out of any surface stream or from the spring of the plaintiff after it (the water) has appeared upon the surface or in any surface spring or stream. In this action the plaintiff seeks damages for the diversion of the underground water that otherwise would have reached his spring and streams.

In the other action the agreed statement of facts differs only in that it shows the existence upon plaintiff's farm of a well which for years had provided water for the various purposes of the plaintiff, and that as a result of the defendant's operations it had taken percolating underground water which otherwise would have reached this well, and had also taken percolating underground water from beneath the surface or soil of the plaintiff's land to such an extent that his crops will not now grow as they did formerly, and the taking of such percolating water has damaged the plaintiff's hay and crops and also has reduced the level of the water in his well. For this diversion damages are sought.

The judgments under review are based upon the theory that the city has an absolute right to appropriate all percolating water found beneath the land owned by it, and to use the water for purposes entirely unconnected with the beneficial use and enjoyment of that land, to the extent, indeed,

of making merchandise of the water and conveying it to a distance for the supply of the inhabitants of East Orange, and that although by such diversion the plaintiff's spring, well and stream are dried up, and his land rendered so arid as to be untillable, it is *damnum absque injuria*.

The judgments are attacked upon the ground that the law recognizes correlative rights in percolating subterranean waters; that each landowner is entitled to use such waters only in a reasonable manner and to a reasonable extent beneficial to his own land, and without undue interference with the rights of other landowners to the like use and enjoyment of waters percolating beneath their lands, or of water courses fed therefrom.

The law respecting the rights of property owners in percolating subterranean waters is of comparatively recent development, the first English decision bearing directly upon the question having been rendered in 1843. *Acton* v. *Blundell*, 12 *Mees. & W.* 324; 13 *L. J. Exch.* 289. This was followed by *Chasemore* v. *Richards* (1859), 7 *H. L. Cas.* 349; 29 *L. J. Exch.* 81; 5 *Jur.* (*N. S.*) 873; 1 *Eng. Rul. Cas.* 729. These cases may be taken as establishing for that jurisdiction the rule upon which the judgments under review are based.

They were followed by a considerable line of decisions in this country in which the English rule was adhered to, and which will be found discussed in *Washb. Easem.* *363, *390; *Ang. Waterc.*, §§ 109-114, and 30 *Am. & Eng. Encycl. L.* (*2d ed.*) 310, 313.

The soundness of the English doctrine was, however, challenged by the Supreme Court of New Hampshire in a well-considered case decided in 1862 (*Bassett* v. *Salisbury Manufacturing Co.*, 43 *N. H.* 569; 3 *Am. L. Reg.* (*N. S.*) 223 (*O. S., Vol.* 12); 82 *Am. Dec.* 179), where it was elaborately reasoned that the doctrine of absolute ownership is not well founded in legal principles, and is not so commended by its practical application as to require its adoption; that the true rule is that the rights of each owner being similar, and their enjoyment dependent upon the action of other landowners, their rights must be correlative and subject to the operation

of the maxim *sic utere*, &c., so that each landowner is restricted to a reasonable exercise of his own rights and a reasonable use of his own property, in view of the similar rights of others. This decision was followed by *Swett* v. *Cutts* (1870), 50 *N. H.* 439; 9 *Am. Rep.* 276; 11 *Am. L. Reg.* (*N. S.*) 11, where the court again laid it down that the landowner has not an absolute and unqualified property in all such water as may be found in his soil, to do what he pleases with it, as with the sand and rock that form part of the soil, but that his right is to make reasonable use of it for domestic, agricultural and manufacturing purposes, not trenching upon the similar rights of others.

The doctrine thus enunciated has come to be known in the discussion of the topic as the rule of "reasonable use."

The question as to which of these contrary rules obtains in this state has not been set at rest by any previous adjudication in this court.

In *Ocean Grove* v. *Asbury Park* (1885), 13 *Stew. Eq.* 447, both parties were seeking a general supply of water for the respective summer resorts. Ocean Grove obtained by boring upon its own land a supply of water for its inhabitants. Asbury Park sought water by boring upon lands of third parties with the consent of the latter. Vice Chancellor Bird refused an injunction upon the ground that subterranean percolating waters are the absolute property of the owner of the fee, citing the leading English cases and some American decisions that follow them. His decision could, perhaps, have been based upon the doctrine of reasonable use, because neither party was proposing to confine its use of the waters to the beneficial enjoyment of the lands from which they were taken.

In 1898 the case of Harper et al. *v.* Mountain Water Co. came on to be tried at Circuit before Chief Justice Magie, afterwards Chancellor. Plaintiffs were millowners, and sued the company for damages for abstracting water from the sources of a natural stream to the use of which they were entitled. The evidence tended to show that defendant's water works were so constructed and managed as to withdraw water directly from the head sources of the stream after this water

had issued from the ground. It also tended to show that percolating underground water was abstracted, some of which would and other would not, in the ordinary course of nature, have come to the surface and formed a part of the sources of the stream. The learned Chief Justice denied a motion for nonsuit because of the evidence of the abstraction by the defendant of water that had already come to the surface. With respect to subterranean waters, he expressed himself as being unable to see why the abstraction thereof was not an actionable wrong, and expressed grave doubt, amounting to dissent, respecting the English cases that deny the liability. But deeming the English rule established by the weight of authority, he declined to apply his own view at *nisi prius*. Accordingly, in his instructions to the jury, he ruled that the interception of percolating underground water by the defendant's wells did not furnish a cause of action, and confined the plaintiff's damages to such as resulted from the diversion of waters that had come to the surface. There was a verdict for the plaintiff, which was sustained by the Supreme Court on rule to show cause, the court saying that the defendants could not complain of the law laid down by the trial judge respecting their liability. Plaintiff's successors in title afterwards obtained an injunction to restrain further diversion. *Harper, Hollingsworth & Darby Co.* v. *Mountain Water Co.*, 20 *Dick. Ch. Rep.* 479. Vice Chancellor Emery in his opinion gives a resume of the Chief Justice's instructions to the jury. His personal dissent from the English rule we have taken from the report of the trial. It is likewise referred to in the opinion of the Supreme Court in the case at bar.

The decision of this court in *McCarter, Attorney-General,* v. *Hudson County Water Co.*, 4 *Robb.* 695, had to do with the diversion of the waters of the Passaic river, and the validity of a statute that is designed to preserve and maintain the lakes, ponds, brooks, creeks, rivers and streams of this state, and prevent the waters thereof from being carried by conduits into other states. The *dictum* found on page 710 of the opinion, and quoted by the Supreme Court in the case at bar, viz., "We may concede, for present purposes, that subter-

ranean waters, such as may be reached only by driving wells, when thus acquired, become absolutely the property of the proprietor of the soil, and may be dealt with by him as merchandise," was, of course, not intended as a decision that such is the law, but, as the opinion shows, was conceded only for the purpose of narrowing the discussion by distinguishing the exact point that was then before the court.

In the absence of any anciently established rule of the English common law upon the subject, and of any contrary decision in this court, and in view of what will shortly appear, that the decisions in other jurisdictions are conflicting, with the trend of modern decisions in this country strongly in favor of adopting the doctrine of reasonable use, this court is at the present time open to decide the cases at bar in accordance with sound reason and general principles of law and justice.

A brief review of the leading English decisions will not be out of place.

*Acton* v. *Blundell* (1843), 12 *Mees. & W.* 324; 13 *L. J. Exch.* 289, held that a landowner has no such right or interest in a subterranean water course as to enable him to maintain an action against a landowner who, in carrying on mining operations upon his own land in the usual manner, drains away the water from the land of the first-mentioned owner and lays his well dry. This decision might well have been based upon the doctrine of reasonable use, but it was rested upon the absolute ownership on the part of the mineowner of all that lay beneath the surface of his land.

In *Dickinson* v. *Grand Junction Canal Co.* (1852), 7 *Exch.* 282; 21 *L. J. Exch.* 241, the defendant was a corporation operating a navigable canal. It sunk a well upon its own land and placed over it a pump and steam engine whereby it pumped into its summit level a quantity of underground water, a part of which would otherwise have reached a certain natural stream by underground flow, a part would have reached the same stream by underground percolation, and further withdrew from the stream a portion of the water flowing therein which by means of the operation of defend-

ant's well and pump was drawn off through underground percolation. The plaintiffs, who were millowners further down the stream, were, in consequence of defendant's operations, prevented from working their mills as beneficially as otherwise they might have done. The Court of Exchequer held that at common law the company was liable to an action for abstracting the water which actually had formed a part of the stream, by sinking a well, and for abstracting water which never had formed a part of the stream, but was prevented from doing so in its natural course by the excavation of defendant's well, whether the water was part of an underground water course or percolated through the strata. The court distinguished Acton v. Blundell on the ground that to maintain an action in that case would be to limit the defendant landowner in the full enjoyment of his rights of property, while in the case presented the use of the ground water by the defendant was disconnected from the beneficial enjoyment of defendant's land.

In *Chasemore* v. *Richards* (1859), 7 *H. L. Cas.* 349; 29 *L. J. Exch.* 81; 5 *Jur.* (*N. S.*) 873; 1 *Eng. Rul. Cas.* 729, the facts were that the plaintiff was the occupier of an ancient mill on the river Wandle, and that he and his predecessors for more than sixty years had used and enjoyed as of right the flow of the river; that the river was supplied above the plaintiff's mill in part by the rainfall on a district many thousand acres in extent, comprising the town of Croydon and its vicinity, the water sinking into the ground to various depths and then flowing and percolating through the strata to the river, part rising to the surface and part finding its way underground in courses which continually varied. The defendant represented the members of the local board of health of Croydon, who, for the purpose of supplying that town with water, sank a well upon their own land in the town and about a quarter of a mile from the river, and pumped out large quantities of water for the supply of the town, thereby intercepting underground water that otherwise would have found its way into the river and so to the plaintiff's mill. The question was whether the plaintiff could maintain an action

for this diversion, abstraction and interception of the underground water. The Court of Exchequer, upon the authority of *Broadbent* v. *Ramsbotham,* 11 *Exch.* 602; 25 *L. J. Exch.* 115, gave judgment for the defendant, which was affirmed by the Court of Exchequer Chamber, Justice Coleridge dissenting. 2 *Hurlst. & N.* 168. The House of Lords affirmed the judgment under review upon grounds that practically overrule the decision in Dickinson *v.* Grand Junction Canal Co.

The decision in Chasemore *v.* Richards has been treated as finally settling the law for England, and has been followed or approved in numerous subsequent English cases.

A few of the earlier American decisions may also be noted.

In *Greenleaf* v. *Francis* (1836), 18 *Pick.* 117, the Supreme Court of Massachusetts held that, in the absence of rights acquired by grant or adverse user, a landowner may dig a well on any part of his land, notwithstanding he thereby diminishes the water in his neighbor's well, unless in so doing he is actuated by a mere malicious intent to deprive his neighbor of water. Although this case is sometimes cited as authority for the rule afterwards established in England, the reasoning of the opinion is consistent with the doctrine of "reasonable user."

The same is true of *Roath* v. *Driscoll* (1850), 20 *Conn.* 533; 52 *Am. Dec.* 352.

*Wilson* v. *City of New Bedford* (1871), 108 *Mass.* 261; 11 *Am. Rep.* 352. Here the city had constructed a reservoir from which water percolated underground to the plaintiff's cellars about a thousand feet distant, and prevented the natural passage of water underground into the natural stream on which the dam of the reservoir was constructed. The court sustained the plaintiff's right of action, citing Chasemore *v.* Richards without disapproval, but holding that the principle upon which it is decided did not prevent the plaintiff from having a recovery.

*Chase* v. *Silverstone* (1873), 62 *Me.* 175; 16 *Am. Rep.* 419, held that a defendant who dug a well on his own land in good faith for the obtaining of water for his own domestic uses was not liable to damages that incidentally resulted to

plaintiff by means of the diversion of water that had been accustomed to percolate or flow in an unknown subterranean current into the plaintiff's spring. The decision is fully justifiable under the doctrine of "reasonable user," and, indeed, is so justified in the opinion, but the court goes further and cites with approval Acton v. Blundell, Chasemore v. Richards and later English cases.

But it is not too much to say that the rule adopted in Chasemore v. Richards, and the reasoning upon which it was rested, have not withstood the test of time, experience and ampler discussion, and it is entirely clear that the strong trend of more recent decisions in this country is in the direction of a repudiation of the English rule and the adoption of the doctrine that there are correlative rights in percolating underground waters; that no landowner has the absolute right to withdraw these from the soil to the detriment of other owners, and is limited to reasonable uses.

The modern tendency of the courts is well shown in 30 *Am. & Eng. Encycl. L.* (2d ed.), tit. *"Water and Water Courses,"* where, after a full citation of the earlier cases, the writer proceeds to say (at p. 314) : "In the later cases the right of a landowner to intercept and divert percolating waters has been subjected to some qualifications on the ground that such right relates to the beneficial use of the waters or of the land for some purpose connected with ordinary operations of agriculture, mining, domestic use or improvements either public or private. Under this doctrine it has been held that a landowner has no right, except for the benefit and improvement of his own premises or for his beneficial use, to drain, collect or divert percolating waters therein, where such act will destroy or materially injure the spring of another, the waters of which spring are used by the general public for domestic purposes; that he cannot drain, collect or divert such waters for the sole purpose of wasting them; that the owner of land cannot gather percolating water by pumps or by natural means that it may be carried to a distant place for use by or sale to strangers having no right to it, in a case where the inevitable result would be to destroy a spring upon the land of an ad-

joining owner, and that a municipality has no right by rea-
son of its ownership of land to collect percolating waters for
distribution to its inhabitants by means of wells and pumps
therein having such suction power as to draw the percolating
waters from the surrounding land to a great distance, thereby
rendering such lands unfit for cultivation. So it has been
held that a landowner cannot collect percolating water by
means of artesian wells and convey it away from his land for
sale to a distant landowner to the injury of his neighboring
landowners."

A brief review of some of the recent decisions will suffice.

The earlier cases in New York repeatedly approved the rule
laid down in Acton *v.* Blundell and Chasemore *v.* Richards.
*Ellis* v. *Duncan* (1855), 21 *Barb.* 230; *affirmed,* 29 *N. Y.*
466; 45 *Id.* 363 (*Court of Appeals*); *Goodale* v. *Tuttle*
(1864), 29 *Id.* 459, 466; *Pixley* v. *Clark* (1866), 35 *Id.* 520,
527; 91 *Am. Dec.* 72; *Village of Delhi* v. *Youmans* (1871),
45 *N. Y.* 362; *Phelps* v. *Nowlen* (1878), 72 *Id.* 39; 28 *Am.
Rep.* 93; *Bloodgood* v. *Ayers* (1888), 108 *N. Y.* 400, 405;
*Van Wycklen* v. *City of Brooklyn* (1890), 118 *Id.* 424. But
most, if not all, of these decisions would be equally justified
under the doctrine of "reasonable user." And in *Smith* v.
*City of Brooklyn* (1899), 160 *Id.* 357; 45 *L. R. A.* 664, the
Court of Appeals sustained an action against the city for the
diversion and diminution of a natural stream upon the plaint-
iff's land, although it appeared that this was caused by the
arrest and collection of underground waters which fed the
stream by percolation through the earth. And in *Forbell* v.
*City of New York* (1900), 164 *N. Y.* 522; 51 *L. R. A.* 695;
79 *Am. St. Rep.* 666, the same court held that a municipal
corporation which, by the operation of a water system consist-
ing of wells and pumps on its own land, taps the sub-surface
water stored in the land of an adjoining owner and in the
contiguous territory, leads it to its own land, and by mer-
chandising it prevents its return, whereby the value of the land
of such owner is impaired for agricultural purposes, is liable
to him for the damages occasioned thereby. The court in this
case clearly rested its judgment upon the doctrine of "reason-

able user." See, also, *Reisert* v. *City of New York* (1903), 174 *N. Y.* 196.

*City of Emporia* v. *Soden* (1881), 25 *Kan.* 588; 37 *Am. Rep.* 265. The plaintiff had erected and for many years maintained and operated mills upon the bank of a river, the power being furnished by a dam built by him. The defendant city then erected water works for municipal purposes and supplied them from this pond, drawing part of the water directly through pipes which led into the pond, and part indirectly by percolation into a well adjacent to the pond. The plaintiff obtained an injunction in the District Court restraining the city from taking water either from the pond or from the well without compensation to the plaintiff. Upon appeal the Supreme Court sustained the injunction in both branches. The opinion by Justice Brewer, while apparently bowing to the authority of *Chasemore* v. *Richards* so far as respects the interception of water that otherwise would percolate towards and into a stream, held that this case had left *Dickinson* v. *Grand Junction Canal Co.* unquestioned with respect to the abstraction of water from a stream by percolation, basing this distinction upon what was said by Lord Hatherley in *Grand Junction Canal Co.* v. *Shugar*, 6 *Chan. App.* 483, 487.

*Katz* v. *Walkinshaw* (1902), 141 *Cal.* 116; 64 *L. R. A.* 236; 99 *Am. St. Rep.* 36, 64; 70 *Pac.* 663; 74 *Id.* 766, held that the owner of a portion of a tract of land which is saturated below the surface with an abundant supply of percolating water cannot remove water from wells thereon for sale, if the remainder of the tract is thereby deprived of water necessary for its profitable enjoyment.

*Cohen* v. *La Canada Land Co.* (1907), 151 *Cal.* 680; 11 *L. R. A.* (*N. S.*) 752, held (distinguishing *Katz* v. *Walkinshaw* and other California cases) that percolating waters may be taken for use of land other than that where found, if this can be done without injury to adjoining owners.

*Barclay* v. *Abraham* (1903), 121 *Iowa* 619; 64 *L. R. A.* 255; 100 *Am. St. Rep.* 365, held that while a landowner has a right to make such beneficial use of water from underground reservoirs in the improvement of his estate as he may choose,

there is no right to draw water from such underground reservoir merely for the purpose of wasting it, to the injury of other landowners having equal rights to use and means of access to it, or of maliciously depriving them of its beneficial use.

*Pence* v. *Carney* (1905), 58 *W. Va.* 296; 6 *L. R. A.* (*N. S.*) 266, held that the owner of land who explores for and produces subterranean percolating water within the boundary of his land is limited to a reasonable and beneficial use of such water, when to otherwise use it would deplete the water-supply of a valuable natural spring of another on adjoining or neighboring land, and thereby materially injure or destroy such spring. •

*Erickson* v. *Crookston Water Works Co.* (1907), 100 *Minn.* 481; 8 *L. R. A.* (*N. S.*) 1250; 10 *Am. & Eng. Ann. Cas.* 843, held that the law of correlative rights applies to the use by adjoining landowners of waters drawn from an artesian basin, and that such proprietors must so use their wells as not to unreasonably injure their neighbors.

*Erickson* v. *Crookston Water Works Co.* (1908), 105 *Minn.* 182; 17 *L. R. A.* (*N. S.*) 650, was a second appeal after a second trial of the case above reported under the same title. On the present occasion the court reiterated the doctrine of "reasonable user."

A review of the reasoning upon which the English doctrine respecting percolating underground waters rests will demonstrate, as we think, that this reasoning is unsatisfactory in itself and inconsistent with legal principles otherwise well established.

Thus, in *Acton* v. *Blundell,* 12 *Mees. & W.* 349, Chief Justice Tindal, in undertaking to show the inapplicability to percolating waters of the law that governs running streams, declared that the ground and origin of the law respecting the latter would seem to be that the right enjoyed by the several proprietors of the lands over which they flow is and always has been public and notorious; that the enjoyment has been long continued and uninterrupted, and therefore based upon

the implied assent and agreement of the proprietors of the different lands from all ages, while underground waters, being concealed from view, there can be no implied mutual consent or agreement between the owners of the several lands respecting them. But, as has been since repeatedly pointed out, the right of the riparian owner to the flow of a natural stream arises *ex jure naturæ,* and not at all from prescription or presumed grant or acquiescence arising from long-continued user. See remarks of Baron Parke, in *Broadbent* v. *Ramsbotham,* as reported in 25 *L. J. Exch.* (at *p.* 121), and remarks of Lord Wensleydale in *Chasemore* v. *Richards,* 7 *H. L. Cas.* (at *pp.* 382, 383); 29 *L. J. Exch.* 87; 1 *Eng. Rul. Cas.* 752, 753, and cases cited.

Again, in *Acton* v. *Blundell,* 12 *Mees. & W.* 351, the Chief Justice said: "If a man who sinks a well in his own land can acquire by that act an absolute and indefeasible right to the water that collects in it, he has the power of preventing his neighbor from making any use of the spring in his own soil which shall interfere with the enjoyment of the soil." Obviously, he failed to note that there is a middle ground between the existence of an absolute and indefeasible right and the absence of any right that the law will recognize and protect. There is room for the existence of qualified and correlative rights in both landowners.

The English rule seems to be rested at bottom upon the maxim, *"Cujus est solum, ejus est usque ad coelum et ad inferos."* Thus, in *Acton* v. *Blundell,* 12 *Mees. & W.* 354, Chief Justice Tindal said that the case fell within "that. principle which gives to the owner of the soil all that lies beneath his surface; that the land immediately below is his property, whether it is solid rock, or porous ground, or venous earth, or part soil, part water; that the person who owns the surface may dig therein, and apply all that is there found to his own purposes at his free will and pleasure." Here the impracticability of applying the rule of absolute ownership to the fluid, water, which by reason of its nature is incapable of being subjected to such ownership, is apparently overlooked. If the owner of Whiteacre is the absolute proprietor of all the

percolating water found beneath the soil, the owner of the
neighboring Blackacre must, by the same rule, have the like
proprietorship in his own percolating water. How, then, can
it be consistent with the declared principle to allow the owner
of Whiteacre to withdraw, by pumping or otherwise, not only
all the percolating water that is normally subjacent to his
own soil, but also, and at the same time, the whole or a part
of that which is normally subjacent to Blackacre? Where
percolating water exists in a state of nature generally through-
out a tract of land, whose parcels are held in several owner-
ship by different proprietors, it is, in the nature of things,
impossible to accord to each of these proprietors the absolute
right to withdraw *ad libitum* all percolating water which may
be reached by a well or pump upon any one of the several lots,
for such withdrawal by one owner necessarily interferes to
some extent with the enjoyment of the like privilege and op-
portunity by the other owners.

Again, the denial of the applicability to underground
waters of the general principles of law that obtain with
respect to waters upon the surface of the earth is in part
placed upon the mere difficulty of proving the facts respecting
water that is concealed from view. But experience has demon-
strated in a multitude of cases that this difficulty is often
readily solved. When it is solved in a given case, by the pro-
duction of satisfactory proof, this reason for the rule at once
vanishes.

It is sometimes said that unless the English rule be adopted,
landowners will be hampered in the development of their
property because of the uncertainty that would thus be thrown
about their rights. It seems to us that this reasoning is
wholly faulty. If the English rule is to obtain, a man may
discover upon his own land springs of great value for medici-
nal purposes or for use in special forms of manufacture, and
may invest large sums of money upon their development;
yet he is subject at any time to have the normal supply of
such springs wholly cut off by a neighboring landowner, who
may, with impunity, sink deeper wells and employ more pow-

erful machinery, and thus wholly drain the sub-surface water from the land of the first discoverer.

In the case before us the city of East Orange might have its underground water-supply cut off or materially impaired by the establishment of deeper wells and more powerful pumps upon some neighboring tract—even upon the tract owned by the plaintiff.

In short, under that rule, *might* literally makes *right,* and we are remitted to—

> "The simple plan,
> That they should take who have the power,
> And they should keep who can."

For a further elaboration of the grounds upon which the "English rule" is open to criticism, and upon which the doctrine of "reasonable user" of subterranean percolating waters is supported, reference may be made to the dissenting opinion of Mr. Justice Coleridge, in *Chasemore* v. *Richards, 2 H. & N.* 188, 195, to the judgment of Lord Wensleydale in the House of Lords in the same case, 7 *H. L. Cas.* 384, 389; 29 *L. J. Exch.* 87, 88; 1 *Eng. Rul. Cas.* 754, 757, and to the opinions in the recent American cases above cited.

Upon the whole we are convinced, not only that the authority of the English cases is greatly weakened by the trend of modern decisions in this country, but that the reasoning upon which the doctrine of "reasonable user" rests is better supported upon general principles of law and more in consonance with natural justice and equity.

We therefore adopt the latter doctrine. This does not prevent the proper user by any landowner of the percolating waters subjacent to his soil in agriculture, manufacturing, irrigation or otherwise, nor does it prevent any reasonable development of his land by mining or the like, although the underground water of neighboring proprietors may thus be interfered with or diverted. But it does prevent the withdrawal of underground waters for distribution or sale for

uses not connected with any beneficial ownership or enjoyment of the land whence they are taken, if it results therefrom that the owner of adjacent or neighboring land is interfered with in his right to the reasonable user of sub-surface water upon his land, or if his wells, springs or streams are thereby materially diminished in flow, or his land is rendered so arid as to be less valuable for agriculture, pasturage or other legitimate uses.

It follows that the judgments of the District Court and of the Supreme Court must be reversed.

And since we have before us, in the record of each judgment, an agreed statement of facts that includes all essentials upon which the right of recovery depends, such statement of facts ought to be treated as a special verdict, upon which this court will render the same judgment that the trial court ought to have rendered—that is, an affirmative judgment that the plaintiff do recover his damages. *Sullivan* v. *Visconti,* 39 *Vroom* 543, 551; *affirmed,* 40 *Id.* 452; *Reischman* v. *Masker, Id.* 353, 357; *National Bank of New Jersey* v. *Berrall,* 41 *Id.* 757, 762.

But since there is an absence of any finding or stipulation as to the amount of the damages, a writ of inquiry should be awarded, and the record remitted to the Supreme Court, to which court application should be made as to the mode of executing the writ of inquiry.

*For affirmance*—None.

*For reversal*—The Chancellor, Chief Justice, Garrison, Swayze, Reed, Parker, Bergen, Minturn, Bogert, Vredenburgh, Vroom, Gray, Dill, J.J. 13.