**BOARD OF PUBLIC UTILITY COM'RS OF NEW JERSEY v. ELIZABETHTOWN WATER CO., Consolidated.**

**No. 4206.**

Circuit Court of Appeals, Third Circuit.

Sept. 22, 1930.

 

John O. Bigelow, of Jersey City, N. J., for appellant.

Wm. M. Wherry, of New York City (Frederick J. Faulks, of Newark, N. J., and Thomas H. Wight and James C. Forsyth, both of New York City, of counsel), for appellee.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

WOOLLEY, Circuit Judge.

The District Court, finding rates which the Board of Public Utility Commissioners of New Jersey had prescribed for the Elizabethtown Water Company, either on the master's valuation of its property or on the court's valuation, confiscatory and violative of the due process clause of the Fourteenth Amendment to the Constitution, restrained the Board from enforcing an order by which it set aside rates which the company had filed and substituted rates based on its own valuation of the company's property. The Board of Public Utility Commissioners appealed.

As the water company has challenged the Board's valuation and as the Board now challenges the valuations made by both master

and court, it becomes necessary first to find the rule of law which will govern the fact issues in this case. We are not concerned with the growth of the law or the various rules for determining base values for rate making purposes which have from time to time been promulgated under varying conditions, for the rule which is applicable to this case, though not new, is the last pronouncement of the Supreme Court on the subject, made in United Railway & Electric Company of Baltimore v. Public Service Commission of Maryland, 280 U. S. 234, 50 S. Ct. 123, 125, 74 L. Ed. 390, handed down after the argument in the instant case. It appears from the opinion that that case, like this one, is the ordinary instance where a utility company attacked a commission's rate order as confiscatory. Although the value of the property which was used in the public service was there fixed by the Commission and accepted by the utility company, the matters in dispute concerned the lawful method of computing an allowance for depreciation, whether upon costs or present value of the property. This question, though arising where otherwise the value of the property had been agreed upon, differs in no legal respect from the question here as to the method of computing, in the first instance, the value of property in the public service as a rate base—whether at cost or present value.

In answering the question as to the method of computing depreciation—one element in determining a base for rate making purposes—the Supreme Court pointed out that "the fundamental principle to be observed is that the property of a public utility, although devoted to the public service and impressed with a public interest, is still private property, and neither the corpus of that property nor the use thereof constitutionally can be taken for a compulsory price which falls below the measure of just compensation." The court also pointed out that "a fair return within this principle" is to be "tested primarily by present-day conditions"; and that no rule can be laid down which will apply uniformly to all sorts of utilities. "What may be a fair return for one may be inadequate for another, depending upon circumstances, locality and risk." It further said that "what will constitute a fair return in a given case is not capable of exact mathematical demonstration. It is a matter more or less of approximation, about which conclusions may differ," and a "court in the discharge of its constitutional duty on the issue of confiscation must determine the amount to the best of its ability in the exercise of

a fair, enlightened, and 'independent judgment as to both law and facts,'" holding that anything less than a return of 7.44% sought by the utility would, in that case, be confiscatory and in violation of the due process clause of the Fourteenth Amendment. That is the trend of the opinion. But the point which touches and rules the instant case has to do with the method of valuing a company's property, used and useful in the public service, brought into view, in the case cited, on a contest as to the proper allowance for annual depreciation, which the Commission had based upon cost. The court recognized the propriety of such an allowance in order to restore property worn out or impaired and the necessity continuously to maintain it as nearly as practicable in the same level of efficiency for public service. This, of course, calls for expenditures equal to the "cost" of worn out equipment, the question being, whether cost at the time of purchase or cost at the time of replacement, the latter meaning present value. The court said—and this is where that decision rules this case—"It is the settled rule of this court that the *rate base* is *present value.* * * *" We shall therefore dispose of the fact issues of this case by determining the present value of the property of the utility as a base for rates. Incidentally, there is a dispute between the parties as to the period at which the "present" value is to be determined, whether at the time the bill was filed or at the time the decree was entered, as the Board contends. We hold, as the issue arose with the bill, or, rather, from the order which the bill attacked, that the time at which to compute values is primarily the time of the Board's order fixing the alleged confiscatory rates and also the time of the inquiry, Willcox v. Consolidated Gas Co., 212 U. S. 19, 29 S. Ct. 192, 53 L. Ed. 382, 48 L. R. A. (N. S.) 1134, 15 Ann. Cas. 1034; McCardle v. Indianapolis Water Co., 272 U. S. 400, 47 S. Ct. 144, 71 L. Ed. 316, when the testimony bears upon that period, rather than the time of entry of the decree which was two years later, during which period many variables as to costs and values inevitably entered in respect to some of which there is no satisfactory testimony. It would be impossible precisely, or approximately, to determine the value of the property at the time of the decree on evidence which was directed, and limited, to values at the time of the order and at various times pending the taking of testimony. For these reasons we shall pass on the evidence as it came to the master and eventually reached the trial court. Naturally much of it related

to values prior to the order and brought down to the date of giving testimony.

Exercising that "independent judgment" on the facts which the Supreme Court said should be exercised, we shall approach the question of base valuation of property in the public service and ultimately of returns thereon at the rates prescribed by the Board and rates filed by the company by disposing of all the substantial issues the parties have raised and see where the case stands.

We have before us the new Equity Rule No. 70½ (28 USCA § 723), not yet effective, requiring the "three judges" of a "court of first instance" "to find facts specially and state separately its conclusions of law thereon" in cases of this kind, and we have in mind the insistence of the Supreme Court, last made in Railroad Commission of Wisconsin v. Maxcy, 281 U. S. 82, 50 S. Ct. 228, 74 L. Ed. 717, that in cases of this character district courts shall state the grounds for their decisions. Although a reviewing court, we shall, nevertheless, observe the spirit of these pronouncements by separately approving or disapproving the several specific findings of value of the main items entering into the aggregate base valuation together with the grounds for our conclusions. We shall, however, omit a few which, even in the aggregate, are too small to affect the judgment whatever it may be.

The valuations of the water company's property, variously reckoned, are these:

The Board by its decision in the order of May 26, 1927 under review fixed the value at $6,650,000 as of June 30, 1926.

The water company contended that the true value was in excess of $9,200,000.

The master found it to be $8,402,020.50.

The District Court found the value to be "at least" $10,000,000 and, either on its own base finding or on the master's, issued its writ of injunction against the Board.

The Board conceded that a return of 7¼% on its valuation of $6,650,000, or a return of $482,125, is permissible and held it sufficient.

A return of 7¼% on the master's valuation of $8,402,020.50 would be an annual revenue of $609,146.49 and on the court's valuation of $10,000,000 an annual revenue of $725,000. A return of $482,125 would therefore, on the master's valuation, be 5.74% and on the court's 4.82%. As the actual return of the company's business for six months under the Board's order was $204,360.80, it is plain the water rates which the Board pre-scribed did not produce its own estimate of a fair return even on its own property valuation. As the rates which the company filed, when applied to the valuation which first the master and later the court found, do not yield 7¼%, even on the Board's claim that the return is now $550,000, there can be no valid objection to the allowance of the company's rates unless the items that went into the building up of the base present value of its property in public use were appraised too highly. These we shall take up presently.

The utility company—Elizabethtown Water Company, Consolidated—owns and operates water works and supplies water for public and domestic use in several small municipalities in the State of New Jersey, having a combined population in 1928 of 170,000 and an annual growth of about 5%. Its tangible property consists of land on which are constructed reservoirs, pumping stations, filtration plants, and transmission and distribution pipe mains. Its intangible property consists of water rights, good will, and rights of way for pipe lines.

The valuations found by the master and later by the court were based primarily on an inventory of the company's property which was admitted in evidence over the Board's objection that its figures were largely hearsay and not within the knowledge of the witness producing it. The objection seemed to be based less upon the knowledge of the producing witness than upon the manner in which the company should prove the value of its property. We are really at a loss to see any other way in which to start such proof and the consequent calculation. The first inventory was made in 1919 and was submitted to the Board in the 1922 rate case and acted upon. It was later revised and brought up to date for purposes of this case. This was the company's way of telling the Board what property it had in public service. The inventory gave its property item by item. These items became the bases of expert testimony as to values. It was on this testimony, produced by both parties, that the case was decided. The values in the inventory stated against the items were of course open to attack. These figures did not bind the Board, nor did they bind the master or the trial court, nor do they bind this court on review. The instrument was admissible for the very practical purpose for which it was introduced. And just here we shall pass on another matter of evidence.

The Board offered in evidence a table or chart showing water rates charged in thir-

ty-three cities in different parts of the country, some of whose plants were owned and operated by municipalities, as a basis of comparison with the rates imposed by the Board. The information contained in this chart was largely secured by correspondence and was therefore hearsay. Aside from this technical objection, we hold that this doubtful evidence of comparative rates was properly excluded because there was little, if anything, to show that the cities in question were comparable with the municipalities here served or that the operating costs were similar. Ashland Water Company v. Railroad Commission of Wisconsin (D. C.) 7 F.(2d) 924; In re Consolidated Gas Company of New York, P. U. R. 1928-E 19, 36.

Again, before taking up the findings of values, we shall dispose of another assignment of error which is to the effect that the master expressly declined to decide what properties of the utility were used and useful in the public service, but included in the rate base all properties which it owned. Four items are pointed out. One, barns, farmhouses, pig pens and chicken coops, occupied or used by employees or rented; another, cinder fills—values too inconsequential in amount to discuss.

■ The third pertains to the Watchung Reservoir; the fourth to the right of way leading to it and a small hydraulic pumping equipment connected with it and supplanted by steam power; all items appearing on the company's valuation having a total base value of $64,910. The Board contends that this small reservoir, located on a tract of sixty-seven acres of land, was built twenty years ago and no water has been in it for three years. This the company admitted but it contended that the reservoir is employed as a "balancing" reservoir and "overflow for the mains" and is reserved, and in that sense is used, as a pressure safety valve to prevent bursting of the mains when the pressure reaches an excessive amount, the pressure being regulated once or twice a week. On this evidence, standing uncontradicted, we cannot say that the reservoir and its connections are not used in the public service.

Land Values. The company's lands comprise a storage yard and pumping station, and several reservoirs including the Watchung reservoir with adjacent lands, and still other lands, which the company valued at $900,000 and the Board at $600,000. The master found a land value of $842,165 of which sum $122,440 was not in dispute. We shall not, indeed we cannot within the per-

missible bounds of an opinion, discuss the great volume of testimony for and against these estimates. It will be enough to say that the value placed on lands by witnesses for the Board was $539,415 and by witnesses for the company was $842,165. The master took the latter sum. The reason he gave for accepting the testimony for the company was that its witnesses seemed better qualified by experience and familiarity with local land values than the witnesses for the Board. However that may be, there is ample evidence to justify his finding and we are inclined, aside from his better opportunity to appraise the testimony by seeing, hearing and judging the qualifications of the witnesses, to the higher figure he adopted.

General Values. On the company's testimony the value of its property was placed at $9,740,496. From this total the master deducted the value of certain items which he either ignored or on which he later found his own values. These deductions were for the value of land, paving over mains, overhead charges, working capital and going costs, aggregating $4,234,926, leaving a balance, according to the company's testimony of $5,505,570 which the master accepted. The deductions included an item of value arising from street paving over mains ($723,920), which the master omitted from his estimate and which the company says should have remained as an ingredient of present value.

■ Where old mains have been covered by modern paving, involving an extra cost of pavement replacement when in the future it becomes necessary to cut the paving in order to reach, repair or replace the mains, the company urges that the mains thus covered have, at present, a correspondingly greater value which should be included in the total "present value" at the figure above stated. The master declined to allow theoretical cost of cutting pavements not actually incurred as an element of present value and deducted it from the company's estimate, evidently relying on Des Moines Gas Co. v. Des Moines, 238 U. S. 153, 35 S. Ct. 811, 59 L. Ed. 1244. The learned trial court regarded this as error in view of Ohio Utilities Company v. Public Utilities Commission of Ohio, 267 U. S. 359, 45 S. Ct. 259, 69 L. Ed. 656, and by its decree added the item of $723,920 to the master's estimate. It is difficult to conceive that this company will ever replace its entire piping system at one time in one operation. It is reasonable to believe that from time to time the company will find it necessary to cut through a pavement in order to get at a main

and that the cost of cutting and replacing the pavement will be greater than the cost of the original installation. But we cannot see how paved covering of mains has added to their "present" value, though it may add to the cost of repairing them. That cost has not yet been incurred, may never be incurred, or it may be incurred so far in the future that conditions may have changed and the cost decreased or at least changed from what it is today, to be taken care of by a corresponding change of rates. It seems unfair to estimate and add the present cost of repairs, not made, as an element in ascertaining present value of property for rate making purposes. That would subject people who improve their streets to the penalty of paying higher water rates for all time. Therefore we deduct the sum included for this item from the court's decree of $10,000,000 and sustain the master's deduction.

 Pipes. In appraising tangible property a very real issue arose with respect to the cost of pipes, although the outcome, whatever it should be, will not affect the ultimate question of valuation on which to base a fair return, for if found at the Board's figure and a corresponding deduction be made, the rates filed by the Board would still produce a return that would fall short of the 7¼% it stated the company should have.

The company's figure of cost of pipes f. o. b. Elizabeth was $2,295,193. The Board says this figure should be "pruned." It was reached by reckoning small pipe at $49 a ton and pipe of larger sizes at $45 a ton. These prices were current on December 31, 1926 and, indeed, as late as May, 1927, the month of the order under review. The value of the plant and properties was fixed by the Board as of June 30, 1926. The price at the time testimony was given on the subject (March 1928) was substantially lower (about 33%) due to depression in the industry beginning in 1927 and extending into 1928, the figure of $34 per ton being agreed upon. The difference in total pipe valuations between what the master allowed and the Board claimed was about $699,435. The Board based its claim on a contention that spot price for spot reproduction at the time of the hearing should govern; the company, that as it would take at least two years to reproduce its piping system, a price for pipe must be found that would cover the period of reproduction. Although taking a price current at the effective date of the Board's rate order, the company did not insist that that price should govern because current at that date but contended, as above stated, that a

price of reproduction through a two year period of reconstruction should control. And to this view we, too, are inclined. This is just such a matter as doubtless the Supreme Court referred to as "not capable of exact mathematical demonstration. It is a matter more or less of approximation," to be determined by a court "to the best of its ability in the exercise of a fair, enlightened and independent judgment." Spot reproduction is impossible of accomplishment, McCardle v. Indianapolis Water Company, 272 U. S. 400, 47 S. Ct. 144, 71 L. Ed. 316; so spot price for pipe is not a proper cost measure of a pipe construction that would take two years. Some other cost figure must be found, looking upon the future of the pipe industry in the light of the (then) present and the past. This is what the company did through its experts, who, we find, gave a figure which was an approximation based on sensible reasoning and which was sound enough for the master to adopt.

Sources of Water Supply. The company in its original calculation of a rate base included as an element its source of water supply at $1,010,000. This sum is not the value of the land beneath which the water flows for that item is already included and separately allowed. It is a claimed value of water in addition to value of land. It is directed either to a claimed ownership of water beneath the surface or a claimed property right to draw it off and sell it. The Board contested this item and the master omitted it from his estimate of total present value as a rate base on the ground that in New Jersey the owner of land has not title to percolating waters beneath the surface for withdrawal, distribution and sale, Meeker v. East Orange, 77 N. J. Law, 623, 74 A. 379, 25 L. R. A. (N. S.) 465, 134 Am. St. Rep. 798, and that the company's right in this instance to withdraw water from beneath the land, distribute and sell it is a franchise so to do, conferred by its charter and the charters of its underlying companies, and that, of course, the value of a franchise cannot be capitalized into present value of property for rate making purposes. The learned trial judge on exceptions to the master's report found the omission to be error and included this item in his calculation which, together with the element of street paving, raised his estimate of present value of the company's property in the public service to at least $10,000,000. He included the value of source of water supply on authority of McCardle v. Indianapolis Water Company, 272 U. S. 400, 47 S. Ct. 144, 71 L. Ed. 316, where it was held that for rate mak-

ing purposes "water rights should be included" in the present value. It should be noted however that the water rights in that case—rights to withdraw water from a natural stream and a natural creek and sell it—were riparian rights which the utility had acquired by purchase and development so that it, indubitably, had a right of property in the water. Being a property right of unquestioned value, the court included it in the rate base. So also in San Joaquin & Kings River Canal & Irrigation Co. v. Stanislaus County, 233 U. S. 454, 459, 460, 34 S. Ct. 652, 58 L. Ed. 1041. But the Board here contended that the company owns neither water nor water rights, and that what it has is at most a franchise. It owns lands with percolating or migratory water beneath it which, by permission of its charter, it has tapped by wells. Having been accorded full value for its land the Board contended it was not entitled to an added value for water, under the New Jersey law.

We find the question difficult to solve, first, because we hesitate to construe a state law unless compelled to do so, and next, because of lack of evidence on the precise character of the water supply underlying the company's land in New Jersey. Laying aside the law which authorizes the inclusion of values of riparian rights acquired and owned and forbids the valuation and inclusion of rights acquired under franchises and confining ourselves to the case of water withdrawn from beneath privately owned land through wells, it is clear to us that the source of water supply may or may not be a thing of value for rate making purposes according to the character of the water supply itself. If, for instance, as in Florida, water everywhere is only a few feet beneath the surface, no value can be given it outside the present cost value of sinking shallow wells, which comes under another head. On the other hand, if, as in the Nevada and Arizona deserts, water is rarely found at any depth in hundreds of square miles, yet when found is a thing of great value, we can conceive that, when discovered and developed, its value should be included in a rate base. Still another instance. In some states, as in some regions of New Jersey, water may be found in abundance at reasonable depths on one side of a ridge and not at all or only at great depths and with slight flow on the other side. On this subject, as it pertains to the case in hand, we are constrained to say that the evidence is not full enough to permit of a decision with any degree of certainty, even if we were required to make one. But in this case a decision one way or the other is not necessary to a proper determination of a rate base on which to predicate the allowable return of 7¼%. If excluded from the rate base as in the master's calculation, still the rates imposed by the Board will not yield the return it allows; and neither will the rates filed by the company.

Returning to the master's figure of $5,505,570 (previously noted) which was left after deducting sundry unacceptable company figures from its total of $9,740,496, the master added $842,165 as his valuation of land (previously discussed) and $82,710.50 for

Easements. The company's witnesses appraised the easements or rights of way for pipe lines at $82,710.50. The Board at the argument here put the value at $58,000. The company thought and the master found there was no dispute as to the company's figures. There was a dispute between counsel at the argument before the master but there is little contradiction in the testimony. The evidence compelled the master's finding.

Following the value of easements the master added the stipulated sum of $36,197 for cost of paving actually cut at reproduction cost depreciated, making a total value for tangible property of $6,466,642.50. Then follow values of three intangibles:

First, allowance for overhead at 17%, or $1,099,329. That some allowance should be made is evidenced by the concession of the Board in this regard. It complains that only 15% was allowed in Middlesex and Plainfield-Union water cases. (D. C.) 10 F. (2d) 519; (D. C.) 30 F.(2d) 846. The Board has not convinced us that the allowance is excessive.

Second, allowance as a going concern of 10%, or $756,597. The Board allowed nothing. To say that this property has no additional value as a going concern over the bare cost of reproduction of its physical property does not accord with the evidence, nor does it follow the trend of such cases where value as a going concern is recognized and, when proved, is included. Des Moines Gas Co. v. Des Moines, 238 U. S. 153, 35 S. Ct. 811, 59 L. Ed. 1244. McCardle v. Indianapolis Water Company, 272 U. S. 400, 47 S. Ct. 144, 71 L. Ed. 316; Hackensack Water Company v. Board, 98 N. J. Law, 41, 119 A. 84; Id., 100 N. J. Law, 177, 124 A. 925; Adams Express Company v. Ohio, 166 U. S. 185, 17 S. Ct. 604, 41 L. Ed. 965. The evidence sustains the value of 10%.

Third, reserve for working capital, $150,000. This is a reduction of $50,000 from the company's claim and an increase of $50,000 over the Board's claim. We do not understand that the Board seriously contested this allowance. Anyhow, it is a proper element of value and on the evidence was properly appraised.

When these three items were added the master found the total value of all property, tangible and intangible, amounted to $8,472,-568.50, which after a deduction made necessary by an error amounted finally to $8,-402,020.50. This we find to be as nearly a correct determination of a rate base as can be figured out from the mass of evidence in this case.

While of course this court has no power to fix rates, the rates prescribed by the Board and the rates filed by the utility company are necessarily pertinent in determining whether the order is confiscatory and the decree is right or wrong. The Board by its brief reduces the return of 7¼%, which we understand it first regarded as permissible, to a claimed return of 6½% or 7%, citing cases where the Supreme Court found 6% and 7% adequate. "What is a fair return," that court said in the case of the Baltimore utility, supra, "cannot be settled by invoking decisions of this court made years ago, based upon conditions radically different from those which prevail today." It would be difficult, indeed impossible on the record before us, to compare conditions in the cited cases with those in this case and therefore improper to limit the return in this case to the return in one or another of those cases. A return of 7¼%, regarded by the Board as reasonable, is not, on the evidence, produced by either the Board's rates or the company's rates on the court's base valuation or on the master's base valuation.

The decree of the District Court is affirmed, costs both below and on appeal to be taxed against the plaintiff-appellee. Board of Public Utility Commissioners v. Plainfield-Union Water Company (C. C. A.) 30 F.(2d) 859.